E-filing

FILED

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

MAY 2 0 2008

Name  Hernandez    Fidel        C.
    (Last)        (First)     (Initial)

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Prisoner Number  F-09157,   B1-C5-02

Institutional Address  **Folsom State Prison, "Old Folsom"**
                **Post  Office  Box  950**
                **Folsom,  California  95763**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

FIDEL C. HERNANDEZ
(Enter the full name of plaintiff in this action.)

CV 08 2539

      vs.

MATHEW KREMER, Warden

_____

_____

_____

(Enter the full name of respondent(s) or jailor in this action)

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.
(To be provided by the clerk of court) **JSW**

**PETITION FOR A WRIT
OF HABEAS CORPUS**

**(PR)**

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located. If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1   <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3   jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14       Sup. Ct. of Santa Clara Co.  70 W. Hedding St,

15                  Court                              Location

16           (b)    Case number, if known  CC236592

17           (c)    Date and terms of sentence  12/2/05, 15-years to life
                    plus 10-year for alledged gun
18           (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                  parole or probation, etc.)          Yes _x_    No _____

20                  Where?

21                  Name of Institution: __**Folsom State Prison, "Old Prison"**__
                                          **Post Office Box 950**
22                  Address: _____**Folsom, California 95763**__

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Alleged second degree murder plus used of weapon.

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1    3. Did you have any of the following?

2        Arraignment:                          Yes x___      No ____

3        Preliminary Hearing:                  Yes x___      No ____

4        Motion to Suppress:                   Yes x___      No ____

5    4. How did you plead?

6        Guilty ____    Not Guilty _x_    Nolo Contendere ____

7        Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9        Jury _x_    Judge alone____    Judge alone on a transcript ____

10   6. Did you testify at your trial?                Yes ____    No x___

11   7. Did you have an attorney at the following proceedings:

12       (a)   Arraignment                     Yes _x_      No ____

13       (b)   Preliminary hearing             Yes _x_      No ____

14       (c)   Time of plea                    Yes ____     No ____

15       (d)   Trial                           Yes _x_      No ____

16       (e)   Sentencing                      Yes _x_      No ____

17       (f)   Appeal                          Yes _x_      No ____

18       (g)   Other post-conviction proceeding  Yes _x_    No ____

19   8. Did you appeal your conviction?               Yes _x_     No ____

20       (a)   If you did, to what court(s) did you appeal?

21             Court of Appeal                 Yes _x_      No ____

22             Year: 11/15/06   Result: denied _____

23             Supreme Court of California     Yes _x_      No ____

24             Year: Feb 2007 Result: denied _____

25             Any other court                 Yes _x_      No ____

26             Year: 5/14/07    Result: denied without prejudice ____

27

28       (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1    petition?                                        Yes _____    No x

2    (c)    Was there an opinion?                     Yes x       No _____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                     Yes _____    No x  N/A

5           If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?          Yes x       No _____

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16   (a)    If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding. Attach extra paper if you need more space.

18          I.    Name of Court: Superior CT of Santa Clara County

19                Type of Proceeding: Petition for writ of habeas corpus

20                Grounds raised (Be brief but specific):

21                a. SEE PAGE 6a through 6nn hereinafter

22                b._____

23                c._____

24                d._____

25                Result: denied                          Date of Result: 5/14/07

26          II.   Name of Court: Superior Court of Santa Clara county

27                Type of Proceeding: Petition for writ of habeas corpus

28                Grounds raised (Be brief but specific):

1  a. SEE PAGE 6a through 6nn hereinafter

2  b.

3  c.

4  d.

5  Result: denied                Date of Result: 11/6/07

6  III.  Name of Court: Court of Appeal Sixth Appellate Dist.

7  Type of Proceeding: Petition for writ of habeas corpus

8  Grounds raised (Be brief but specific):

9  a. SEE PAGE 6a though 6nn hereinafter

10  b.

11  c.

12  d.

13  Result: denied                Date of Result: 12/3/07

14  IV.  Name of Court: Supreme Court of California

15  Type of Proceeding: Petition for Review

16  Grounds raised (Be brief but specific):

17  a. SEE PAGE 6a through 6nn

18  b.

19  c.

20  d.

21  Result: denied                Date of Result: 1/30/08

22  (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23  Yes _____    No x

24  Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26  State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1    need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One: SEE GROUND ONE IN PAGE 6a.

6

7        Supporting Facts: SEE PAGE 6a through page 6g

8

9

10

11       Claim Two: SEE GROUND A. IN PAGE 6g.

12

13       Supporting Facts: SEE PAGE 6g through 6'i'

14

15

16

17       Claim Three: SEE PAGE 6j, THERE IS GROUND B.

18

19       Supporting Facts: SEE PAGE 6g through 6k

20

21

22

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

I.

## PETITIONER'S STATEMENT WAS COERCED

In People v. Vasila, (1995) 38 Cal.4th 865, 45 Cal.Rptr.2d 355. (Promise of more leniency treatment renders confession involuntary, even if promise kept) Defendant was convicted of possession of illegal guns. Defendant had revealed where the guns were after an interrogation in which he was encouraged to talk by being promised an O.R. release and a guarantee that the case would not be prosecuted in federal courts. Both of these promises were kept. In an appeal in which the admissibility of these statements was challenged, the prosecution argued that, since the promise were kept, the statements were not coerced. Court disagreed, and held that officers cannot legally induce a confession by making promises of leniency. A confession based on a promise is coerced, whether the promise is kept or not. Here, the involuntary confession was inadmissible, as were the guns to which defendant led the officers after he talked.

In People v. Azure, (1986) 178 Cal.App.3d 591, 224 Cal.Rptr. 158. (Police action renders confession involuntary) During a 4-hour interrogation, police lied to defendant, implied that things would go easier on him if he admitted his guilt, and implied that he would not be free to leave the interrogation room until he admitted his guilt. Court held that the confession was involuntary as a matter of law.

In U.S. v. Harrison, 34 F.3d 886, (9th Cir. 1994). (Statement made after police imply that a failure to cooperate would be a detriment makes statement involuntary) After defendant's arrest, she was advised of her rights. Before she was asked whether she

6a

1    wished to talk, the officer detailed the evidence they had against
2    her, and then implied that the court would be told if she did not
3    cooperate. Defendant then gave a statement. The trial court
4    found the statement admissible but, on appeal, court ruled the
5    statement involuntary. While in some circumstances a defendant
6    can be told that her cooperation will be communicated to the
7    proper authorities, the same cannot be said of a refusal to
8    cooperate. Such refusal is a defendant's constitutional right,
9    and the only apparent objective in so informing a person is to
10   coerce a statement.

11   In In re Shawn D.(1993) 20 Cal.App.4th 200, 24 Cal.Rptr.2d
12   395. (Minor's confession coerced under totality of circumstances)
13   A 16-year minor was arrested for a residential burglary and
14   questioned. During the interrogation by the investigating
15   officer, the minor was untruthfully told that his co-defendant
16   had already confessed. He asked the minor to be truthful, as
17   he already knew what happened. When the minor denied any wrong-
18   doing, the officer told him he was lying and that he was putting
19   his pregnant girlfriend in a precarious situation. The officer
20   then said he just wanted to get the stolen property back, wanted
21   minor to apologize to the victim so the minor would feel better.
22   He was told the police report would reflect his cooperation, but
23   that if he continued lying he would go to juvenile hall or to
24   jail. The officer implied that if defendant was an accomplice
25   and didn't actually go into the house, his guilt would be less
26   if he told the truth. The questioning was periodically interrup-
27   ted and the minor was left alone. When the minor finally admitted
28   dropping off the co-defendant, but still denied knowledge of

6b

1   the burglary, the officer told him he was lying. His girlfriend
2   was then brought into the room and the two were left alone. She
3   told the minor the officer had told her she would be locked up
4   and taken to jail if she did not tell what she knew. The officer
5   returned and the minor made some more admissions. The girlfriend
6   was taken from the room, then the officer returned and handcuffed
7   the minor. The minor was told he could be tried as an adult and
8   sent to prison. He was frequently reminded of this, and expressed
9   concern about it. The minor was told that his cooperation would
10  result in the officer personally talking to the D.A. at juvenile
11  hall. Finally, The minor confessed. On appeal, court held that
12  this confession was coerced and should have been suppressed. The
13  court noted that defendant was only 16, was unsophisticated and
14  naive despite prior police contacts, and he suffered from a
15  post-traumatic stress disorder from seeing his younger brother
16  hit by a speeding car. Court noted that the officer repeatedly
17  lied to appellant, implied that his girlfriend would get into
18  trouble, implied that he would be tried as an adult, and pressured
19  him to "come clean." Moreover, even if these tactics did not
20  make the confession involuntary, the repeated suggestions that
21  he would be treated more leniently if he confessed clearly did.

22      In U.S. v. Tingle, 658 F.2d 1332 (9th Cir. 1981). (Threats
23  and promises make confession involuntary) Defendant confessed
24  to crime after F.B.I. agents threatened her with not seeing her
25  child for a long time if she did not cooperate, warning her of
26  the long-term imprisonment that could be imposed, and promising
27  lenient treatment and early release if she cooperate. Court held
28  that this psychological coercion resulted in an involuntary

1  confession.

2  Also see <u>Collazo v. Estelle</u>, (1991) 940 F.2d 411.  (Police

3  efforts to dissuade defendant from invoking Miranda raised involun-

4  riness implications.)

5  In the present case, Detective Edward Zarate told petitioner

6  during the interrogation that if petitioner did not admit his

7  crime, Zarate was going to  present it to the judge and petitioner

8  was going to be in a lot of trouble.  (1 Supp. CT 171-172.)

9  Detective Zarate indicated that he promised to petitioner that

10  he was going to tell the judge that petitioner cooperated. Petitio-

11  ner told Zarate that they are going to give him the same time

12  whether if he cooperated or not.  Then Detective Zarate implied

13  that in this country existed a lot of degrees of homicide which

14  are first degree, second degree like up to five.  (1 Supp. CT

15  197.)

16  Detective Zarate implied that petitioner would have been

17  convicted of even five years if petitioner admitted he was guilty.

18  (Ibid.)  Detective Zarate implied that he was going to tell the

19  judge that petitioner cooperated and to give petitioner a sentence

20  of even five years.  (Ibid.)

21  Zarate told petitioner that he was going to think the worst

22  and that he was going to write the worst and that he was going to

23  present the worst if petitioner failed to admit he did the crime.

24  Zarate implied that he was going to do the above before a judge

25  and the prosecution.  (1 Supp. CT 202-203.)

26  Zarate indicated that he wanted to hear the story of petitio-

27  ner, that he was going to write in his report, that he and

28  Garcia were going to a judge and they were going to tell the

1  what petitioner had done, Zarate indicated that he was going to
2  tell the judge that petitioner is good person, had children, that
3  petitioner had job, and that petitioner did stay here in town.
4  (1 Supp. CT 273.)

5      Detective Zarate indicated that petitioner had the opportunity
6  to erase what happened, to erase what petitioner did and to correct
7  and recognize and let the judge know.  (1 Supp. CT 200.)

8      Petitioner said that he wanted guarantees that Zarate and
9  Garcia were going to help him before he confessed.  Then Zarate
10  indicated.  I can help you like I told you.  I can help you to
11  investigate all you could say to me.  I could help you to take
12  out all you could say to me to help you prove all that you could
13  say to me.  Zarate went on saying that he was going to write the
14  reason that petitioner tell Zarate and Zarate was going to show
15  what petitioner said to a judge.  (1 Supp. CT 212.)

16      Detective Zarate told petitioner before petitioner confessed
17  that if Petitioner forced him to put the case with what he got
18  it is not going to look good because Zarate was going to show
19  to the judge and the prosecution that petitioner refused to admit
20  his crime.  However, Zarate did not say clearly that he was going
21  to present the denial of petitioner to a judge and the prosecution.
22  But Zarate implied that he was going to tell the judge and the
23  prosecution that petitioner refused to admit his crime.  (1 Supp.
24  CT 213.)

25      Detective Zarate told petitioner that he wanted to know what
26  petitioner done, that way Zarate can help petitioner.  (1 Supp.
27  CT 220.)

28      At the end of the interrogation, petitioner requested Zarate

6e

1   to help him.  (2 Supp CT 323; RT 583.)

2       Petitioner inventented his story and incriminated himself

3   with the killing of Mr. Jose Magana because he believed that

4   Detectives Garcia and Zarate were going to help him with the

5   judge and prosecution.  In that, petitioner thought that he was

6   going to get convicted and sentenced to five years.  See (1 Supp.

7   CT 197.)  Petitioner believed the detectives because he

8   did not have experience with the criminal justice system.  Due to

9   petitioner's ignorance,  Petitioner interpreted that the

10  detectives told him that the sentence was going to be five years,

11  and because petitioner wanted to stopped the detectives' coercion,

12  petitioner invented the story of having shooting at Mr. Jose

13  Magana something that was not true.

14      Petitioner's rights under the Fifth Amendment had been

15  violated.  Therefore, his conviction should be reversed.

6f

A.  **Misrepresentations as to extent of defendant's liability for murder amount to implied promise**

In People v. Cahill, (1994) 22 Cal.App.4th 296, 28 Cal.Rptr. 2d 1. (Misrepresentations as to extent of defendant's liability for murder amount to implied promise) Defendant was a suspect in a burglary/murder. In order to induce him to talk, the police made representations regarding his liability that if the murder was not premeditated there could be no firs-degree murder charge. The officer then urged defendant to "help himself," by suggesting that he would not be guilty of as high a degree of murder if there were mitigating circumstances. No mention of felony-murder was made. Court held that in the context of this interrogation, the remanks of the officers amounted either to a threat or to a promise of leniency, and the confession was involuntary.

In the present case, Detective Zarate asked petitioner the reason for killing Jose Magana. Zarate implied that if petitioner killed Jose for threats that Jose had made toward petitioner that could be minimal circumstances. Zarate said that if petitioner kept saying that two men killed Jose and stole his money. Zarate is going to prove that it did not happen as petitioner claimed. Then Zarate said to petitioner that he was going to be in a lot of problems. Zarate implied that if petitioner admitted killing Jose, petitioner's involment was going to be minimal Detective Garcia said to petitioner that it was important to know if petitioner planned or just the shooting occurred. Zarate told petitioner that Jose was a dog, dangerous, and wanted to control people. Zarate said to petitioner that he was giving a chance to petitioner to say the truth. Zarate said to petitioner to save

1   himself because it was his only chance that he was going to give
2   petitioner.   Zarate wanted to know the reason petitioner shot at
3   Jose.   Zarate suggested to petitioner if he shot at Jose because
4   Jose stole money from petitioner.   Petitioner said that he did
5   not have any money.   Zarate implied that petitioner shot at Jose
6   because Jose threatened petitioner or because Jose was going to
7   shot at petitioner first.   Zarate told petitioner that he was
8   intelligent, good person, and not crazy or dangerous.   (1 Supp.
9   CT 171-174.)

10   Zarate said to petitioner that he wanted to know the truth
11   right now because this is the only chance for petitioner to do the
12   minimal about what happened.   (1 Supp. CT 176.)

13   Zarate said to petitioner to say the truth because that is
14   what the judge is going to see.   Zarate said to petitioner that if
15   petitioner says what happened, Zarate is going to tell the judge
16   that petitioner shot at Jose because Jose was dangerous or because
17   Jose threatened petitioner, or because Jose was going to shot at
18   petitioner first.   (1 Supp. CT 180.)

19   Detective Garcia asked petitioner if he planned the shooting,
20   or if the shooting occurred in a moment, or suddenly.   (1 Supp.
21   CT 191.)   Zarate said to petitioner if he planned the shooting, or
22   if it just occurred.   (1 Supp. CT 191.)   Garcia said that Richard
23   Alan Davis planned the     kidnapping and death of Poly Klass.
24   Then Garcia told petitioner that Davis was a dangerous person, but
25   petitioner did not get into anybody's house.   Garcia continued
26   asking petitioner if he planned the shooting or if it occur just
27   like that.   (1 Supp. CT 192.)

28   Zarate told petitioner that he can help him to investigate all

6h

1  possible to help him. But Zarate wanted to know the reason for the
2  shooting and from there Zarate said to petitioner that he had told
3  petitioner, that there are a lot of degrees of homicide in this
4  country and in this state.  (2 Supp. CT 211.)
5  The detectives told petitioner that there are many degrees of
6  homicide in this state.    They wanted to know why  petitioner shot
7  at Jose.  The detectives said that existed accidental deaths, there
8  are homicide due to fights, there are homicide due to threats.
9  The detectives said to petitioner that if he killed Jose due to
10  an example mentioned above, his shooting would be minimal.  (2 Supp.
11  CT 238, 247, 268, 276.)

12     Petitioner's confession was involuntary.  Therefore, his
13  conviction should be reversed.  Petitioner's right under the
14  Fifth Amendment had been violated.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

6'i'

1

2

3

4

B. **Police told petitioner that if he refused to cooperate the refusal was going to be communicated to the judge and prosecutor.**

In the present case, Detective Edward Zarate told petitioner during the interrogation that if petitioner did not admit his crime, Zarate was going to present such refusal to the judge and petitioner was going to be in a lot of trouble.  (1 Supp. CT 171-172.)

Detective Zarate told petitioner that if petitioner forced Zarate to put the case with what Zarate got it is not going to look good because Zarate was going to show all things the way they happened and Zarate was going to put petitioner at the scene. Zarate said that what petitioner said did not fit, and that the reason that petitioner's story did not fit is because petitioner did not want to say the truth.  Zarate said that he was going to tell them that petitioner is lying and refused to say what happened. (2 Supp. CT 213.)

Detective Zarate told petitioner; You know .. it is not clear the investigation because what he's telling me judge it does not fit so we have to think about it... the mo.. the ugliest about what happened... let's think the ugliest about what happened... that's how I can help you.  (Ibid.)

Detective Enrique Garcia told a story of a man who stole a bicycle to go to work.  Then the man explained to the jury and the judge the reason for stealing the bicycle.  Garcia said to petitioner that the man who stole the bicycle got a break because he told the story to the judge and jury.  Detective Garcia said that if the man who stole the bicycle would not have giving the

6j

1  story to the judge and jury, the judge and jury never would have
2  learned that the man stole the bicycle because he need it to go
3  to work to support his children.   Detective Garcia said that the
4  man who stole the bicycle told the judge and jury that he did not
5  have intention of taking the bicycle and keep it.   The man explai-
6  ned to the judge and the jury that he was going to return the
7  bicycle to the owner.   But Garcia said that the man who stole
8  the bicycle got a break because he provided a story. (2 Supp. CT
9  213-217.)

10   In U.S. v. Harrison, supra, 34 F.3d 886, (9th Cir. 1994).
11  (Statement made after police implied that a failure to cooperate
12  would be a detriment makes statement involuntary).   After defen-
13  dant's arrest, she was advised of her rights.   Before she was
14  asked whether she wished to talk, the officer detailed the
15  evidence they had against her, and then implied that the court
16  would be told if she did not cooperate.   Defendant then gave a
17  statement.   The trial court found the statement admissible but,
18  on appeal, court ruled the statement involuntary.   While in
19  some circumstances a defendant can be told that her cooperation
20  will be communicated to the proper authorities, the same cannot
21  be said of a refusel to cooperate.   Such refusal is a defendant's
22  constitutional right, and the only apparent objective in so
23  informing a person is to coerce a statement.

24   If this Court cannot find a promise of leniency in this case,
25  it should find that petitioner's statement was coerced when the in-
26  terrogating detectives  claimed that they were going to communica-
27  te to the judge and the prosecution petitioner's refusal to
28  cooperate.   Petitioner's Fifth Amend Rights had been violated.

6k

III.

### PETITIONER DID NOT RECEIVE PROPER MIRANDA WARNINGS.

During the interrogation the detective told petitioner that he had a right to an attorney. The detective failed to tell petitioner when he have the right to an attorney. Inter alia, the detectives failed to tell petitioner that if he did not have money to hire an attorney, that an attorney would have been provided to him without any cost.

The records in this case is silent about the above. Detective Zarate tried to minimized his mistake to recorder the above by saying that Detective Garcia turned on the tape recording after he provided the proper Miranda warning to petitioner. (6 RT 547-548.)

Detective Zarate and Detective Garcia doctored the tape recorded of petitioner's statement to the police. For that reason is that the records is silent about when petitioner was entitled to the attorney. And also the record is silent about an attorney could be provided to him without cost if petitioner did not have money to hire one.

If the detectives would have told petitioner that he was entitled to an attorney during his interrogation and without any cost if petitioner did not have money, there is no doubt that petitioner would have told the detectives that he wanted an attorney. Petitioner thought that he only could have an attorney during his interrogation if he pays for one. For that reason is that petitioner told Detective Enrique Garcia that he was going to get an attorney, but he did not have money. (2 Supp. CT 101.)

1    In U.S. v. Noti,739 F.2d 610 (9th Cir. 1984) (Defendant must

2  be advised of right to have attorney during questioning)  Failure

3  to advise defendant that he had right to an attorney during police

4  questioning was reversible error.

5    In U.S. v.Bland, 908 F.2d 471 (9th Cir. 1990).  Court held

6  that the Miranda warning given to defendant by his parole officer,

7  which failed to mention that he was entitled to have an attorney

8  during questioning, was inadequate, and his confession therefore

9  should have been excluded.

10    In U.S. v. Connell, 869 F.2d 1349 (9th Cir. 1989) (Confusing

11  Miranda warning results in suppression of confession)  During

12  Miranda advisement, defendant was told orally that if he wanted a

13  lawyer, "you must make your own arrangements ... this will be at

14  no expense to the Government.  If you cannot afford ... a lawyer,

15  one may be appointed to represent you."  Defendant was then handed

16  a written Miranda form, which stated if he could not afford a

17  lawyer "arrangements will be made ... to obtain (one) in accordance

18  with the law."  Court reversed subsequent  conviction, holding

19  that these warnings were confusing and did not clearly inform

20  defendant that if he could not afford an attorney he had the

21  right to have an attorney appointed for him prior to interrogation.

22    Petitioner claimed that the detectives and the prosecution

23  doctored the original tape recorded of petitioner's statement to

24  the police because these people had the custom to altered evidence,

25  and to convict  people even though they are innocent.  The Mercury

26  News reported that the police and the prosecution of Santa Clara

27  County have the habbit of convicting people even though they are

28  innocent.  SEE EXHIBIT A ATTACHED HEREIN.

1     Petitioner was denied his Fifth Amendment rights to the United

2  States Constitution when the detectives failed to tell petitioner

3  at what stages he was entitled to have an attorney.  The police

4  failed to tell petitioner that he was entitled to have an attorney

5  prior the questioning.  Inter alia, the detectives failed to

6  inform petitioner that if he did not have money to hire an attorney

7  that an attorney would have been appointed to him without any

8  cost to him.   Petitioner's conviction should be reversed.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV.

### THE TRIAL COURT'S ERRONEOUS ADMISSION OF PETITIONER'S CONFESSION TO THE POLICE, OBTAINED IN VIOLATION OF MIRANDA AND THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION, PREJUDICED PETITIONER AND REQUIRES REVERSAL.

Petitioner's statements to detectives Zarate and Garcia during a three-hour interrogation were presented into evidence over petitioner's Miranda objections. (2RT 22-23, 6RT 542-543; 1CT 26-35; and 2 Supp. CT 1-417 [People's Ex. Nos. 79, 80 and 81])

At the beginning of the interrogation, petitioner was advised of and waived his Miranda rights (Miranda v. Arizona, 384 U.S. 436). (1Supp.CT 205; 6RT 547.)

During the interrogation, petitioner did not unequivocally invoke the right to counsel. (Davis v. United States, (1994) 512 US 452, 459 [114 S.Ct. 2350, 129 L.Ed.2d 362].) Nevertheless, he clearly desired that an attorney to help him with his case. Petitioner said that, out of fear that the police would lay all blame on him if they could not find another suspect, he wanted to hire an attorney but lacked the funds to do so. (1 Supp. CT 101.) Likewise, he related a conversation with his friend, Pablo, in which he said, "I'm afraid dude I say to him I don't know I want to see an attorney I say to him I'm going to . . . I don't have money. . . " (1 Supp. CT 158.) After the police told petitioner that they could put him at the crime scene alone with the victim and they put pressure on him to reveal "man to man" "the reason" for the shooting, petitioner again raised the topic of counsel by asking, "[o]kay, the county gives me an attorney, no?" (1 Supp. CT 220-221.) The police acknowledged

6'o'

1 | that his bare understanding of procedure was correct without
2 | providing any further details about it or attempting to clarify
3 | if petitioner wanted to assert his right to counsel at that
4 | time.  Detective Zarate simply replied, "Yes, when . . . they
5 | give you an attorney, yes."  (1 Supp. CT 221.)

6 | The police then asked petitioner for "the reason" for the
7 | shooting.  (1 Supp. CT 222.)  Detective Garcia extolled petitioner
8 | to "start over" and "start erasing the error."  (1 Supp. CT 222-
9 | 223.)  This exchange occurred next (1 Supp. CT 223-224, emphasis
10 | added):

11 | ZARATE:  What happened Fidel, why"
12 | CUEVAS [PETITIONER]:  And why don't I tell
13 | it to an attorney.
14 | ZARATE:  Pardon?
15 | GARCIA:  You could do it. . . and you could
16 | tell it in court too that's all . . . what
17 | happens now is that you could tell it to
18 | anyone you want.
19 | CUEVAS [PETITIONER]: Uh huh.
20 | GARCIA:  But what we are telling you we are
21 | the ones doing the case first.
22 | CUEVAS [PETITIONER]:  Uh huh.
23 | ZARATE:  This is the case that I'm going to present.
24 | ZARATEs [sic] the.. the reason.. the truth. . .
25 | what.. what is going to change now.. to a future..
26 | what happened happened.
27 | The police then kept asking petitioner for the "reason" behind
28 | the shooting and continued the interrogation.  (1 Supp. CT 225-

6p

226.)  Subsequently, petitioner confessed.  (1 Supp. CT 276 et seq.)

The picture that emerges of petitioner is one that fits the description of a particular type of suspect set forth in Davis v. United States supra,  512 U.S. 452, which held that only unambiguous invocations of counsel triggered the police duty to cease questioning.  "We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspect who- because of fear, intimidation, lack of linguistic skills, or a variety of other reasons - will not clearly articulate their right to counsel although they actually want to have a lawyer present."  (Id., at 460.)  Although expressing sympathy for such a suspect, Davis determined that, on balance, it was more important to promote efficient police investigative techniques by adopting a bright line rule about what constitutes an invocation.  (Id., at 460-461.)

As those suspects who are unable to clearly articulate their actual desire for counsel, Davis assumed that the Miranda warning were themselves sufficient to protect the constitutional right at stake.  "[T]he primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves.  '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.'''  (Ibid., quoting Moran v. Burbine (1986) 475 U.S. 412, 427 [106 S.Ct. 1135, 89 L.Ed.2d 410].)

Here, however, the protections of the initial Miranda advisement were vitiated by detective Garcia's misleading remarks

6q

1    about when petitioner had a right to consult with an attorney.
2    When petitioner asked, "[a]nd why don't I tell it to an attorney"
3    (1 Supp. CT 223), detective Garcia said petitioner "could do
4    that. . . [b]ut what we are telling you [is] we are the ones
5    doing the case first." (1 Supp. CT 224, emphasis added.)  Garcia's
6    comment conveyed that the police were first going to "do the
7    case," as they were obviously in the process of doing by interro-
8    gating petitioner, before petitioner could talk to counsel.
9    This is the antithesis of what Miranda demands, which is an
10   advisement that a suspect may consult with an attorney before
11   speaking with the police. (Miranda, supra, 384 U.S. 436, 479;
12   California v. Prysock (1981) 453 U.S. 355, 360-361 [101 S.Ct.
13   2806, 69 L.Ed.2d 696].)

14       Detective Garcia's misleading comments about when the right
15   to counsel attached vitiated the efficacy of the Miranda warnings
16   by closing the door to their assertion.  Hence, they violated
17   petitioner's Fifth Amendment privilege against self-incrimination.
18   It is improper for the reference to the right to counsel to be
19   "linked with some future point in time after the police interro-
20   gation." (Id., at 360; Pope v. Zenon (9th Cir. 1994) 69 F.3d
21   1018, 1022-1024.)

22       The Miranda violation prejudiced petitioner. (Chapman v.
23   California, 386 U.S. 18, 24.)  In the absence of petitioner's
24   erroneously admitted confession, the jurors had a plausible
25   basis for finding reasonable doubt about petitioner's guilt for
26   murder.  There were no eyewitnesses to the shooting, and no
27   physical evidence indicated petitioner was the culprit.  In the
28   admissible portion of petitioner's statement to the detectives,

petitioner blamed the shooting on drug robbers. (1 Supp. CT 17-21, 29, 41, 60-61.)  The physical layout of the storage facility where the shooting occurred and nature of its surveillance system were consistent with his story.  (1 Supp. CT 59, 75, 124-127; 4RT 296, 309-310, 315, 338, 350-351, 355, 357.)  The victim's involvement in drug dealing, a dangerous enterprise prone to theft and violence (3RT 46-47, 79, 90, 155-164, 166-167, 4RT 217, 5RT 409, 412-413, 429-430, 5RT 479-481, 483-484, 486-489, 510-511, 520-524.)  Adrian Zerpas indicated that, shortly after the shooting petitioner and the decedent had "fought" about drugs, (5RT 451-454, 468, 476.)

Petitioner claim of Miranda error was properly preserved for review.  (1CT 34; Evid.Code, § 353, subd. (a).)  If not, trial counsel rendered ineffective assistance of counsel.  United States Const. Amendment VI & XIV; Strickland v. Washington, (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

Therefore, admission of petitioner's confession to police, after police misadvised petitioner about the right to counsel, constituted prejudicial error.

V.

### PETITIONER'S SIXTH AMENDMENT RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE COURT ADMITTED THE TESTIMONY OF EFREN AGUILAR.

During trial Miss Maria de la Cruz Magana testified that she received a telephone call from Efren Aguilar informing her that Jose Magana was shot, and that he saw petitioner leaving the building. (3 RT 55.)

Efren Aguilar did not testify in any proceedings in this case. In short, Mr. Aguilar did not testify in the preliminary hearing or in the trial in this case. When Miss Magana testified that Mr. Aguilar told her that he saw petitioner leaving the storage building after Jose Magana was killed constitutes testimonial statement. Under Crawford v. Washington, (2004) 124 S.Ct. 1354, testimonial statements is only admissible when the defendant has had an opportunity to confront and cross-examine his accuser. In this case testimony attributed to Mr. aguilar was introduced through the testimony of Miss Magana. Also see Bockting v. Bayer, 399 F.3d 1010 (9th Cir. 2005). Petitioner's Sixth Amendment right had been violated. Therefore, his conviction should be reversed.

VI.

THE PROSECUTION FAILED TO ESTABLISH DUE DILIGENCE
IN SECURING THE ATTENDANCE OF ALFREDO RAMOS, RENE
SORIANO AND JOSE ADRIAN ZERPAS.

Here, the prosecution presented no evidence to the trial court regarding what efforts, if any, were made to obtain the presence of witnesses Alfredo Ramos, Rene Soriano &  Jose Adrian Zarpas. The trial court never even attempted to determine if any good faith efforts were made by the prosecution to secure the attendance of the witnesses.

Richard Babwin is an investigator for the prosecution.  He said that he attempted to find and served Alfredo Ramos.  He said that defense counsel provided the address of Alfredo Ramos, but Mr. Babwin did not find him.  Mr. Babwin left a business card in the house.  Then Mr. Babwin learned that Alfredo Ramos has been evicted from that address.  (5 RT 394-395.)

After Mr. Babwin gave his explanation, the trial court ruled pursuant to California Evidence Code section 240, that Alfredo Ramos is unavailable as a witness.  (5 RT 396.)

Richard Badwin read the testimony of alfredo Ramos.  (5 RT 397) Ramos said that petitioner was his friend.  Ramos rented the storage locker for petitioner because he unlikely petitioner had proper documents.  (5 RT 400.)  Ramos loaned   a Green, Mercury, License plate 4 UEK 769 to petitioner.  (5 RT 407.)  When Mr. Ramos said that he loaned the green, Mercury to petitioner, that was very prejudicial to petitioner.  Because the theory of the presecution was that a green Mercury card was at the scene on January 14, 2002.

1    The prosecution tried to demonstrate that he tried to locate
2  Alfredo Ramos, but the prosecution knew where Ramos lived because
3  trial counsel gave the address before trial.  Therefore, the
4  efforts of the prosecution to locate Mr. Alfredo Ramos was not
5  enough.

6    As to the attendance of Rene Soriano, the prosecution clearly
7  failed to provide a reason for not located Mr. Soriano.  The
8  testimony that Rene Soriano gave before was read by Vicent Reyna.
9  (5 RT 435.)

10    Soriano is brother in law with Alfredo Ramos.  (5 RT 436.)
11  Soriano helped petitioner to move the property to the storage
12  locker.  (5 RT 438.)

13    Soriano said that petitioner borrowed the green Mercury from
14  Alfredo Ramos.  (5 RT 436.)

15    Again, the testimony of Soriano was very prejudicial to
16  petitioner because he claimed that petitioner borrowed the green
17  Mercury from Ramos.  Liked mentioned above, the theory of the
18  prosecution was that the green Mercury was at the storage building
19  when Jose Magana was killed.

20    As to Jose Adrian Zerpas, the prosecution presented no eviden-
21  ce for his failure to locate Mr. Zerpas.  Mr. Tim McInerney read
22  the transcript of Zerpas's prior testimony.  Mr. Zerpas testified
23  that on the night that Jose was killed, petitioner arrived at his
24  house and told him that he had a fight with Jose.  (5 RT 452, 459-
25  463.)   Zerpas said that petitioner told him that he threw away
26  the gun.  (5 RT 453.)  Zerpas went to pick up the gun where
27  petitioner told him he threw it.  Zerpas said that he found the
28  gun in a garbage dumpster of the apartment where he lived.

6v

1  (5 RT 454-455, 471.)

2      Zerpas said that the gun was chrome .9 millimeter.  He said
3  that he tried to sell the gun for 3 or 4 days, but he could not
4  sell it.  When Zerpas failed to sell the gun, he threw it away in
5  a container.  Zerpas said that he saw petitioner arriving in a
6  green car that appeared in People's Exhibit number 2.  Zerpas said
7  that petitioner parked the green car outside his apartment on the
8  night    Jose was killed.  Zerpas did not tell the police anything
9  about the gun because the police did not ask him anything about it.
10 Zerpas did not want to said anything about the gun because he did
11 not want to be in trouble.  (5 RT 455-456, 457-459.)

12     The testimony of Zarpas was very damaging to petitioner.  There-
13 for, the trial court committed reversible error in allowing the
14 reading of the above witnesses' testimony.

15     "A witness is not 'unavailable' for the purposes of the former
16 testimony exception to the confrontation requirement unless the
17 prosecutorial authorities have made a good-faith effort to obtain
18 his present at trial..." (citing Barber v. Page, (1969) 390 U.S.
19 719, 723-725); Ohio v. Roberts, 448 U.S. 100n S.Ct. 2543.

20     The prosecution bears the burden of establishing their good
21 faith actions in securing the attendant of witnesses.  People v.
22 Sandoval, (2001) 87 Cal.App.4th 1425, 1440.  The Supreme Court
23 in Barber v. Page, 390 U.S. at 723, 725, rejected earlier pronoun-
24 cements that a witness is unavailable simply because that witness
25 was not present within the jurisdiction of the court.  Sandoval,
26 87 Cal.App.4th at 1440.  The prosecution must demonstrate that
27 it attempted in good faith to locate a material witness.  Sandoval,
28 Supra, Eleazer v. Superior Court, (1970) 1 Cal.3d 847.

6w

1  Prosecution failed to do so here.

2      "In reviewing a trial court's due diligence determination, an

3  appellate court should conduct an independent de novo review of

4  the evidence, not merely a review for abuse of discretion."

5  People v. Cromer, (2001) 24 Cal.4th 889.

6      Absolutely no evidence was presented by the prosecution that

7  it made any effort to secure the attendance or even locate Jose

8  Adrian Zarpas and Rene Soriano, petitioner was denied his Sixth

9  Amendment and Due Process right and his right to a fair trial.

10  The Sixth Amendment is designed to prevent the exact violations

11  of petitioner's rights that occurred in the instant trial.

12      Dismissal is mandated by due process and a defendant's consti-

13  tutional right to a fair trial." People v. Mejia, (1976) 57 Cal.

14  App.3d 574; Bellizzi v. Superior Court, (1974) 12 Cal.3d 33, 36.

15      The prosecution is required to show some good faith effort

16  was made to attemp to locate Alfredo Ramos. From the investiga-

17  tor's testimony alone was no enough.

18      The prosecution should not have been permitted to rely on the

19  fact that Alfredo Ramos was evicted from the house. The prosecu-

20  tion was required to establish what good faith efforts were expen-

21  ded to bring Alfredo Ramos, Rene Soriano and Jose Adrian Zerpas

22  into court. People v. Sandoval, (2001) 87 Cal.App.4th 1425. Here,

23  the prosecution failed to establish any efforts were made much

24  less reasonable or good faith efforts to bring Alfredo Ramos,

25  Rene Soriano  and Jose Adrian Zerpas to trial.

26      Due to a lack of good faith showing alone, the previous testi-

27  mony of Alfredo Ramos, Rene Soriano and Adrian Zerpas should have

28  been excluded and reversal is required under the Sixth Amendment.

6x

VII.

### NO EVIDENCE PROVED THE CONVICTION OF SECOND DEGREE MURDER AND THE GUN.

The reason petitioner incriminated for the shooting of Jose Magana was because the detectives told petitioner that they were going to help him with the judge to get five years or a manslauther sentence. (1 Supp. CT 197.) In the beginning of the interrogation, petitioner told the detectives that Efren Aguilar killed Jose Magana. (1 Supp. CT 95.) Also petitioner said that he shot at Jose in the storage locker. But that was not true. Petitioner was not even at the scene when Jose Magana was killed. What happen in this case was that trial and appellate counsel theorized the case as the way they wanted. When petitioner testified in the first trial, he testified based on the advised of Miss Molly O'Neal (Public Defender). Petitioner told Miss O'Neil that he did not kill Jose Magana. But Miss O'Neil did not listen, and she used the theory on her owns accord. Jose Adrian Zerpas testified that he found the .9 mm that was used to kill Jose. He also said that he tried to sell the gun for 3 or 4 days, but when he failed to do so, he threw it away. (5 RT 455-456, 457-459.) A reasonable person, can conclude that Zerpas's story cannot be believed. If petitioner would have told Zerpas that he shot at Jose, common sense dictates that he was going to report it to the police. Thus, Zerpas had the gun because he and Efren Aguilar shot at Jose Magana. Petitioner's position is that the evidence that convicted him for the second degree murder and the gun was based on insufficient evidence. And these convictions must be struck.

1    The conviction of the second degree murder and the conviction

2  of the gun were based on the false confession of petitioner, and

3  pure  lies of others people.

4    Reasonable doubt is defined in California Penal Code § 1096

5  as follows:

6    "It is not a mere possible doubt; because everything

7    relating to human affairs ... is open to some

8    possible or imaginary doubt.  It is that state

9    of the case, which, after the entire comparison and

10   consideration of all the evidence, leaves the minds

11   of jurors in that condition that they ... cannot say

12   they feel an abiding conviction ... of the truth of

13   the charge."

14   In 1894. . . the court interpreted the predecessor of 28

15 U.S.C. § 2243 as vesting federal courts "with the largest power

16 to control and direct the form of judgment to be entered in cases

17 brought up before it on Habeas Corpus." Rogers v. Richmond, 365

18 U.S. 534, 549 (1951); Dowd v. United States ex rel Cook, 340

19 U.S. 206, 210 (1951); In re Bonner, 151 U.S. 242, 261-62 (1894).

20   The United States Court of Appeals for the Ninth Circuit and

21 the United States Supreme Court of the United States indicated,

22 our standards of review for addressing the sufficiency of the

23 evidence to support a conviction is the same on habeas review

24 as it is on direct appeal.  See Mike v. Borg, 947 F.2d 353, 356

25 n. 5 (9th Cir. 1991); see also Jackson v. Virginia, 443 U.S. 307,

26 309, 99 S.CT. 2781, 2789 61 L.Ed.2d 560 (1979) (setting forth

27 standard in a habeas corpus proceeding). Quoting Walter v. Maass,

28 45 F.3d 1355 (9th Cir. 1995).

In re Winship, (1970) 90 S.CT. 1068, 1071, the requirement
that guilt of a criminal charge be established by proof  beyond
a reasonable doubt dates at least from our early years as a Nation.
The "demand for higher degree of persuasion in criminal cases was
recurrently expressed fron ancient times, [though] its crystalliza-
tion into the formula 'beyond a reasonable doubt' seems to have
occurred as late as 1798.  Its now accepted in common law
jurisdictions as the measure of persuasion by which the prosecution
must convince the trier of all the essential elements of guilt."
C. McCormick, Evidence section 321, pp. 681-682 (1954); See also
9 J. Wigmore, Evidence, section 2497 (3d ed. 1940).  Although
virtually unanimous adherence to the reasonable-doubt standard
in  common law jurisdictions may not conclusively establish it
as a requirement of due process, such adherence does "reflect a
profound judgment about the way in which law should be enforced
and justice administere." Duncan v. Louisiana, 391 U.S. 145, 155,
88 S.CT. 1444, 1451, 20 L.Ed.2d 491 (1968).

Expressions in many opinions of the United States Supreme
Court indicate that it has long been assumed that proof of a
criminal charge be a reasonable doubt is constitutionally
required.  See, for example, Miles v. United States, 103 U.S. 304,
312, 26 L.Ed. 481 (1881); Davis v. United States, 160 U.S. 469,488,
16 S.CT. 353, 358, 40 L.Ed. 499 (1895); Holt v. United States,
218 U.S. 245, 253, 31 S.CT. 2, 6, 54 L.Ed. 1021 (1910); Wilson v.
United States, 232 U.S. 563, 569-570, 34 S.CT. 347, 349, 350, 58
L.Ed. 728 (1914); Brinegar v. United States, 338 U.S. 160, 174, 69
S.CT. 1302, 1310, 93 L.Ed. 1879 (1949); Leland v. Oregon, 343 U.S.
790, 795, 72 S.CT. 1002, 1005, 1006, 96 L.Ed. 1320 (1952);

Holland v. United States, 348 U.S. 121, 138, 75 S.CT. 127, 136, 137,
99 L.Ed. 150 (1954); Speiser v. Randall, 357 U.S. 513, 525-526,
78 S.CT. 1332, 1342, 2 L.Ed.2d 1460 (1958). Cf. Coffin v. United
States,  156 U.S. 432, 15 S.CT. 394, 39 L.Ed. 481 (1895).   Mr.
Justice Frankfurter stated that "[i]t is the duty of the government
to establish * * * guilt beyond a reasonable doubt.   This notion-
basic in our law and rightly one of the boasts of a free society-is
a requirement and a safeguard of due process of law in the historic,
procedural content of 'due process.'" Leland v. Oregon, supra,
343 U.S. at 802-803, 72 S.CT., at 1009 (dissenting opinion).   In
a similar vein, the Court said in Brinegar v. United States,   supra,
338 U.S., at 174, 69 S.CT., at 1310, that "[g]uilt in a criminal
case must be proved beyond a reasonable doubt and by evidence
confined to that which long experience in the common-law tradition,
to some extent embodied in the constitution, has crystallized
into rules of evidence consistent with that standard.   These rules
are historically grounded rights of our system, developed to
safeguard men from dubious and unjust convictions with resulting
forfeitures of life, liberty, and property." Davis v. United
States, supra, 160 U.S., at 488, 16 S.CT., at 358 stated  that the
requirement is implicit in "constitutions * * * [wich] recognize
the fundamental principles that are deemed essential for the
protection of life and liberty."  In Davis a murder conviction was
reversed because the trial judge instructed the jury that it was
their duty to convict when the evidence was equally balanced
regarding the sanity of the accused.  The United States Supreme
Court said:  "On the contrary, he is entitled to an acquittal of
the specific crime charged, if upon all the evidence, there is

1 reasonable doubt whether he was capable in law of committing

2 crime. * * * No man should be deprived of his life under the

3 forms of law unless the jurors who try him are able, upon their

4 consciences, to say that the evidence before them * * * is

5 sufficient to show beyond a reasonable doubt the existence of

6 every fact necessary to constitute the crime charged." Id., at

7 484, 493, 16 S.CT., at 357, 360. quoting, In re Winship, supra,

8 (90 S.CT., at 1071-1072.

9 Mr. Justice HARLAN, concurring. I view the requirement of

10 proof beyond a reasonable doubt in a criminal case as bottomed on

11 a fundamental value determination of our society that it is far

12 worse to convict an innocent man than to let a guilty man go free.

13 It is only because the nearly complete and long-standing accep-

14 tance of the reasonable-doubt standard by the States in criminal

15 trials that the Court has not before today had to hold explicitly

16 that due process, as an expression of fundamental procedural

17 fairness, requires a more stringer standard for criminal trials

18 than for ordinary civil litigation. In re Winship, supra, 90 S.CT.,

19 at 1077.

20 In Jackson v. Virginia, (1979) 443 U.S. 307, the United States

21 Supreme Court announced the constitutionally mandated standard

22 applicable to review of the sufficiency of the evidence to support

23 a conviction in a criminal case. The Supreme Court held that the

24 Due Process Clause of the Fourteenth Amendment to the United States

25 Constitution protects a criminal defendant against conviction

26 "except upon proof- defined as evidence necessary to convince a

27 trier of fact beyond a reasonable doubt of the existence of every

28 element of the offense." (Id. at p. 315.) Thus, the constitutiona-

1  lly required standard applicable to determining a claim of insuffi-
2  ciency of the evidence in a criminal case is "whether, after
3  viewing the evidence in the light most favorable to the prosecution,
4  any rational trier of fact could have found the essential elements
5  of the crime charged beyond a reasonable doubt." (Id. at p. 320.)
6  The opinion in Jackson represents a continuing, consistent, and
7  unequivocal line of U.S. Supreme Court decisions giving contour
8  to due process and Sixth Amendment imperatives from In re Winship,
9  to the present. (See, e.g., People v. Korbin (1995) 11 Cal.th
10  416, 422-423.) Thus, for a period spanning 30 years, the rule has
11  been the prosecution has the burden of proving every fact necessary
12  to constitute the crime charged beyond a reasonable doubt. (In re
13  Wiship, (1970) 397 U.S. 358, 364.)

14  California case law is substantially in accord with the standards
15  established by the United States Supreme Court. The test is whether,
16  reviewing the whole record in the light most favorable to the
17  judgment below, substantial evidence is disclosed such that a
18  reasonable trier of fact could find the essential elements of the
19  crime beyond a reasonable doubt. (People v. Johnson, (1980) 26
20  Cal. 3d 557, 578.) Substantial evidence is that which is "reasona-
21  ble, credible, and of solid value." (Ibid.) The focus of the
22  substantial evidence test is on the whole record of evidence
23  presented to the trier of fact, rather than on isolated bits of
24  evidence torn from the record. (People v. Cueveas, (1995) 12
25  Cal.4th 252, 261.) The reviewing court must "presume in support
26  of the judgment the existence of every fact the trier could
27  reasonably deduce from the evidence. (People v. Reilly, (1970)
28  3 Cal.3d 421, 425.) The reviewing court may not reweigh the

6dd

1  evidence.   (People v. Culver, (1973) 10 Cal.3d 542, 548), reappraise
2  the credibility of the witnesses (People v. Barnes, (1986) 42 Cal.
3  3d 284, 303-304), or resolve factual conflicts, since these are
4  functions reserved for the trier of fact (In re Federick G., (1979)
5  96 Cal.App.3d 353, 367).   Reversal is not warranted unless it
6  appears "'that upon no hypothesis whatsoever is there sufficient
7  substantial evidence to support [the conviction].'   [Citation.]
8  (People v. Bolin, (1998) 18 Cal.4th 297, 331.)

9      The evidence presented by the people is insufficient on the
10  following areas:

11      Efren Aguilar appeared on a video of the surveillance of the
12  storage building.   Jose Adrian Zerpas said that he possessed the
13  gun and did not report it to the police.   Petitioner's confession
14  was false.   Petitioner confessed because the detectives told him
15  that he was going to do five years or manslaughter in the state
16  prison.   The detectives told petitioner that they were going to
17  help him with the judge.

18      For argument sake, assuming that petitioner killed Jose Magana,
19  his conviction cannot be more than manslaughter because the records
20  in this case showed that petitioner was afraid of Jose Magana.
21  And the records showed that Jose Magana was short tempered man.
22  The records showed also that petitioner and Jose argued many times
23  because of the missing drugs.

24      The second degree murder and the gun enhancement should be
25  struck.   Because they were based on speculation and the false
26  confession of petitioner.   Petitioner's right under the Fourteenth
27  Amendment had been violated.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VIII.

### PETITIONER REQUESTS AN EVIDENTIARY HEARING.

JailHouse Lawyer, Renato Obando, is doing this case for petitioner. Obando has not found in the records that the trial court has had conducted a hearing before the jury was impanelled to determine the voluntariness of petitioner's confession. Under California Evidence Code § 402, the trial court has an obligation to conduct an evidentiary hearing before the jury is impanelled to determine the voluntariness of petitioner's confession. Liked indicated above, the records in this case is silent about if the trial court conducted the hearing.

In Dretke v. Guidry, (05-965) 397 F.3d 306 (5th Cir. 2005). District Court did not abuse its discretion under Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254, by (i) conducting evidentiary hearing on voluntariness of habeas corpus petitioner's confession despite fact that state trial court had held hearing on same issue, (ii) ruling on confession issue that petitioner, by requisite clear and convincing evidence, rebutted presumption of correctness that admission of petitioner's confession and hearsay testimony against his interest was not harmless error; hearing was justified by district court's conclusions that (i) testimony of petitioner and four lawyers, three of whom had served as assistance district attorneys, formed basis for constitutional claim that, if true, might entitle petitioner to relief, (ii) gaps, inconsistencies, and conflicting testimony in state court hearing record were not explained or even mentioned in state court's findings of fact and conclusions of law, and

1   (iii) such omissions reflected state trial court's failure to
2   make crucial credibility determinations; state court's implied
3   credibility determination - that four lawyers testified falsely -
4   is too extraordinary to avoid development through evidentiary
5   hearing in district court; pursuant to requirements of habeas
6   statute, district court properly concluded that state court,
7   because it made no findings on considerable evidence critical to
8   petitioner's claim, based its decision on unreasonable determina-
9   tion of facts; district court's grant of conditional habeas relief
10  on petitioner's claims under Fifth Amendment (involuntary confe-
11  ssion) and Sixth Amendment (improper hearsay testimony) is
12  affirmed.   74 LW 3518, 3-14-06.

13      In the present case, petitioner confessed because the detecti-
14  ves told petitioner that they were going to talk with the judge
15  and that they were going to ask the judge to impose five years
16  or manslaughter sentencing on petitioner.   The manslaughter promi-
17  se is not clear in the records.   But the five years promise is
18  implied in the records.   See (1 Supp. CT 197.)   The trial court
19  never determined if petitioner confessed because the promises of
20  leniency by the detectives Edward Zarate and  Enrique Garcia.

21      Petitioner requests an evidentiary hearing on all his issues
22  that an evidentiary hearing is necessary.

23
24
25
26
27
28

6gg

IX.

### PROSECUTION COMMITTED MISCONDUCT WHEN HE ELICITED FROM HIS WITNESSES THAT PETITIONER WAS IN JAIL.

In the present case, the prosecution elicited from Mr. Alfredo Ramos that Ramos visited petitioner in the County Jail twice. (5 RT 403-404, 406.)

Eva Cerpas testified that she visited petitioner in the County Jail. (6 RT 614-615, 637.)

When the jury learned that petitioner was in jail, the presumption of innocence that petitioner had stopped to exist. The jury might have thought that petitioner was in jail because the court might have denied bail because petitioner was a very dangerous man, and that petitioner deserved to be incarcerated.

In Duran v. Thurman, 106 F.3d 407 (9th Cir. 1997). The United States Court of Appeals for the Ninth Ciruit reversed Duran's conviction because the prosecution elicited from his witnesses that Duran was visited in jail. The Ninth Circuit ruled that Duran was prejudiced when the jury learned that he was in jail.

This case should be reversed because the jury learned that Fidel was visited in the County Jail. Petitioner's right under the Sixth Amendment to the United States Constitution was violated.

6hh

X.

### TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO MOVE TO SUPPRESS PETITIONER'S STATEMENT.

Trial counsel failed to move to suppress petitioner's statement to the police. People's Exhibits number 76, 77, and 78, are the audio cassettes of the interview of petitioner. The audio tapes were transcribed. People's Exhibits number 79, 80, and 81 are the transcripts of the three audio cassettes of petitioner's statement to the police. These audio cassettes were used against petitioner during the trial, and trial counsel failed to move to suppress them. See (6 RT 543-544, 545-546.)

The statement of petitioner was involuntary because he confessed falsely. Petitioner confessed because Detective Edward Zarate and Detective Enrique Garcia told petitioner that they were going to get a five years sentence. (1 Supp. CT 197.) The Detectives told petitioner that they were going to talk with the judge. Also petitioner was told by the detectives that if he refused to admit that he shot at Jose, they were going to submit a bad report against petitioner.

Under People v. Smithson, (2000) 79 Cal.App.4th 480, 499, 94 Cal.Rptr. 170. A motion to suppress a statement or Miranda rights must be brought under California Evidence Code section 402. Trial counsel failed to do so in this case.

A defendant who has confessed to the commission of a crime has a "constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a determination uninfluenced by the truth or falsity of the

1  confession." Jackson v. Denno, (1964) 378 U.S. 368, 376-377, 84
2  S.Ct. 1774, 1780, 12 L.Ed.2d 908, 915-916. Such a defendant is
3  entitled to a determination of the voluntariness of his confession
4  in the state courts in accordance with valid state procedures. . .
5  . (Id. at P. 398, 84 S.Ct. 1774.) Due Process "requires that a
6  jury (not) hear a confession unless and until the trial judge
7  (or some other independent decision maker) has determined that
8  it was freely and voluntarily given.' (Citations.) (Crane v.
9  Kentucky, (1986) 476 U.S. 683, 687-688, 106 S.Ct. 2142, 2144-2145,
10 90 L.Ed.2d 636, 643.) (quoting People v. Smithson, 94 Cal.Rptr.2d
11 170, 178 (Cal.App.3 Dist. 2000).

12     The detectives failed to tell petitioner that he was entitled
13 to the appointing of a lawyer before the interrogation, and that
14 if petitioner did not have money to hire an attorney, that an
15 attorney could be provided for him without any cost to petitioner.
16 Petitioner was prejudiced by the conduct of trial counsel. There-
17 fore, petitioner has proven the two prongs requirement of Strick-
18 land v. Washington, (1984) 466 U.S. 668.

19     Petitioner's Sixth Amendment right was violated. Therefore,
20 his conviction should be reversed.

21     **A. Failure to object the introduction of hearsay
       evidence.**
22

23     During the trial, Miss Maria de la Cruz testified that she
24 received a telephone call from Efren Aguilar informing her that
25 Jose Magana was shot in the building locker. Mr. Aguilar said to
26 Miss Magana that immediately the shooting, petitioner left the
27 building. (3 RT 55.) Testimonial hearsay was introduced through
28 Miss Magana because Mr. Aguilar did not testify in any court.

1    In People v. Valencia, (No. H029370 C.A. 6th)  The Sixth
2  Appellate District ruled that trial counsel was ineffective by
3  failing to move to exclude hearsay testimony.  This case was deci-
4  ded on December 26, 2006 in the Daily Appellate Report.

5    In the present case, trial counsel was ineffective by failing
6  to move to exclude hearsay testimony.  Therefore, petitioner's
7  conviction should be reversed.  Petitioner's Sixth Amendment right
8  has been violated.

9

10   B.  Failure to object the mentioning of petitioner's
          incarceration.
11

12   During the trial, the prosecution elicited from Alfredo
13  Ramos that he visited petitioner in jail.  (5 RT 403-404, 406.)

14   Eva Cerpas testified that petitioner was in jail and that
15  she visited him.  (6 RT 614-615, 637.)

16   Trial counsel failed to object the mentioning that petitioner
17  was visited in jail. Petitioner  was prejudiced when the jury
18  learned that he was in jail during his trial.  Therefore, petitio-
19  ner has proving the two prongs requirement of Strickland v. Washing-
20  ton,  (1984) 466 U.S. 668.

21   In Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995), the United
22  States Court of Appeals for the Ninth Circuit upheld the District
23  Court's decision to grant the writ of habeas corpus on the ground
24  that petitioner had suffered numerous errors at his trial.  The
25  errors in the Harris trial included defense counsel's failure to
26  investigate and prepare adequately for trial, failure to challenge
27  the admissibility of certain defendant's statements, failure to
28  object to evidence, failure to object erroneous jury instructions

6kk

1  and failure to preserve meritorious appellate issues.

2      Trial counsel was ineffective in this case. Petitioner's right
3  under the Sixth Amendment has been violated. Therefore, his
4  conviction should be reversed.

5

6      C.  **Failure to move to exclude the testimony of Alfredo**
7          **Ramos, Rene Soriano and Jose Adrian Zerpas.**

8      Jose Adrian Zerpas's prior testimony was read to the jury.
9  Zerpas testified that petitioner showed him where he threw the
10 .9 mm.  Zerpas said that he went to look for the gun, found it,
11 and for 3 to 4 days tried to sell it, but he could not, and then
12 he threw it again to the dumpster.  (5 RT 452, 459-463.)  Also
13 Zerpas said that the day Jose was killed, petitioner arrived at
14 his house and told him that  he    fought with Jose.  (Ibid.)

15      Alfredo Ramos testified that petitioner borrowed the green
16 Mercury from Ramos.  The theory of the prosecution was that the
17 green Mercury was in the area of building locker on the day
18 Jose was killed.  (5 RT 407.)

19      Rene Soriano testified that  petitioner borrowed the green
20 Mercury from Alfredo Ramos.  (5 RT 436.)

21      The testimony of these witnesses were very prejudicial to
22 petitioner.  Therefore, petitioner has shown the two prongs
23 requirement of Strickland v. Washington, (1984) 466 U.S. 668.
24 Trial counsel should have moved to suppress the testimony of the
25 above witnesses.  Because he failed to do so, petitioner's right
26 under the Sixth Amendment had been violated.  Therefore, his
27 conviction should be reversed.

28

6'11'

XI.

## APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE.

Ineffective assistance of appellate counsel can constitute cause for procedural default, the petitioner must present the ineffective assistance claim itself to the state courts before using it to excuse the default. Griffin v. Rogers, 399 F.3d 626, 629 (6th Cir. 2005). Petitioner has done the requirements mentioned above.

In evaluating a claim of ineffective assistance of appellate counsel, the United States Court of Appeals for the Sixth Circuit indicated, we look to the analysis established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2054, 80 L.Ed.2d 674 (1984). See also Willis v. Smith, 351 F.3d 741, 745, (6th Cir. 2003). The Strickland test involves two prongs: the "performance prong," where a petitioner is required to show that her attorney's representation "fell below an objective standard of reasonableness," Id., and the "prejudiced prong," which requires the petitioner to demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Id., (emphasis added). Ballard v. United States, 400 F.3d 404, 407 (6th Cir. 2005).

The question presented here is whether an appellate counsel prejudices a client where the attorney fails to raise on appeal [meritorious] claim. We answer in the affirmative, because but for the appellate counsel's ineffectiveness, there is a reasonable probability that the result of the [] appeal may have been

different.   Cover v. Stroub, 349 F.3d 340, 349-50 (6th Cir. 2005).

quoting Ballard v. United States, supra, 400 F.3d at 409.

In the present case, all the above issues had been raised by Jail House Lawyer Renato because appellate counsel failed to raise them on direct appeal.  If this Court finds that any of the above issues had merits, it should also finds that appellate counsel rendered ineffective assistance and then petitioner's conviction should be reversed.  Petitioner's Sixth and Fourteenth Amendments rights had been violated.  **PETITIONER REQUESTS AN EVIDENTIARY HEARING**

CONCLUSION

Petitioner's conviction should be reversed or reduced to manslaughter, because, all the evidence against him was his invented confession.  For argument sake, assuming that petitioner did in fact shot at Mr. Jose Magana, the record is very clear that petitioner was afraid of him.  **AN EVIDENTIARY HEARING REQUESTED.**

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  SEE THE CITING CASES IN PAGE 6a THROUGH 6nn hereinafter.

5  _____

6  _____

7  Do you have an attorney for this petition?                          Yes_____    No_x__

8  If you do, give the name and address of your attorney:

9  _____

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _3/25/08_                          _Fidel C. Hernandez_

14              Date                                Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

EXHIBIT A

Posted on Mon, Jan. 23, 2006

SECOND OF FIVE PARTS

# Prosecutors over the line

By Fredric N. Tulsky
Mercury News

**FOR THREE VETERAN LITIGATORS, WRONGFUL CONVICTIONS PUNCTUATE PATTERNS OF MISCONDUCT LONG TOLERATED BY THEIR SUPERVISORS**

A Mercury News review of the work of Santa Clara County prosecutors turned up a chilling pattern:

Three veteran deputy district attorneys -- Benjamin Field, Terence Tighe and John Schon -- made misjudgments or missteps in cases that ended in wrongful convictions. And in each instance, the district attorney's office missed opportunities to correct the injustices, by failing to react to warning signs in those cases and others the prosecutors handled.

Field, Tighe and Schon had shone in the office of District Attorney George Kennedy by exemplifying the aggressive approach valued there. But significant questions about the three also were developing.

Field had repeated instances of poor judgment and questionable conduct long before he withheld evidence and defied judges' orders in the rape case of Damon Auguste and Kamani Hendricks.

Tighe's conduct in an early 1990s welfare-fraud case and its aftermath helped convince top officials in the district attorney's office that he could not be trusted. Yet within two years, he was allowed to prosecute Miguel Sermeno despite obvious weaknesses in the case, as the Mercury News reported Sunday.

Schon withheld evidence and repeatedly tangled with a judge in a 1997 homicide case, and subsequently was reassigned to non-trial duties. But it took an additional six years before the office acknowledged Schon's misconduct in another case -- the trial of Quedellis Ricardo ``Ricky" Walker, who was freed in 2003 after nearly 12 years in prison for a murder Walker did not commit.

The Mercury News uncovered the pattern of troubling conduct involving Field, Tighe and Schon as part of a three-year study of Santa Clara County criminal justice. The review, which included an unprecedented review of 727 jury trial appeals, established that problems driven by the conduct of the prosecutor repeatedly mar criminal trials.

The examination identified nearly 100 instances of questionable behavior within the study period, and dozens in additional cases, involving more than two dozen prosecutors. Many more trials were undermined by the failure of judges and defense attorneys to challenge prosecutors' conduct.

Top officials in Kennedy's office spent days reviewing those cases in detail with the Mercury News, and offered information to establish that many of the problems were accidental or stemmed from confusion, rather than intentional misconduct. The officials also said they have taken many steps to try to instill a broad commitment to high ethical standards in prosecutions.

Still, Kennedy and his aides concede that the Mercury News found instances in which certain prosecutors acted inappropriately in their quest to win convictions -- and that Field, Tighe and Schon were among those prosecutors.

``Are there people in this office who have acted improperly? It would be impossible to deny that," Chief Assistant District Attorney Karyn Sinunu said. ``Do we condone such conduct? I am confident we do not."

The three prosecutors insist that they have conducted themselves honorably, and each says the criticism from supervisors is unfair. Field said that he has strived ``to play by the rules at all times." Tighe blamed the concerns about him on untrustworthy defense attorneys whose accusations sparked a ``witch hunt" within the office. Schon said, ``I always played fair."



No one suggests that these or other prosecutors seek to lock up people without regard to their innocence. But some experts acknowledge a hazard of the profession: As prosecutors prepare for trial, they tend to become convinced of the rightness of their case -- and unable to recognize the possibility of anything but guilt.

` `The bottom line is that the more prosecutors get ready for the `battle' of trial, the more they want to win,'' said Laurie Levenson, a former federal prosecutor and a professor at Loyola Law School. She said ` `there are great risks to justice when a prosecutor sees a criminal trial as a win-lose proposition.''

Those risks make the supervision of trial prosecutors so crucial.

The Mercury News review established that the district attorney's office, when faced with evidence of prosecutor misconduct, sometimes failed to take timely measures to prevent or minimize injustices. Kennedy has been reluctant to try to fire employees for misconduct -- a fact Sinunu attributes to civil-service protections and her boss's willingness to give wayward prosecutors a second chance.

Nor has the office regularly taken precautions short of dismissal to minimize potential harm. Field still handles cases with life sentences at stake. Tighe continued to try cases even after Sinunu mistrusted him. And despite Schon's misconduct in the 1997 case, top officials failed to review his other cases, even as concerns emerged internally that he had won the wrongful conviction of Walker.

## Benjamin Field
## • Missteps undermine status as rising star

In July 2004, a Santa Clara County Superior Court judge ended a long, costly and bitter legal battle by overturning guilty verdicts against two men, Damon Auguste and Kamani Hendricks, who had been convicted six years earlier of raping a 15-year-old girl.

Judge James Emerson issued a pair of rulings that sharply criticized Field, referring at one point to the prosecutor's conduct as ` `grossly unfair, excessive and unbalanced.''

Emerson found that Field had kept potentially crucial evidence from the defense; had authorized invasive searches in defiance of judicial orders; and had relied on the word of an alleged victim who lied repeatedly at trial.

The judge's harsh words -- which Field said he had ` `taken to heart,'' though he disagreed with them -- resonated in Santa Clara County's legal community. A star within the prosecutor's office, Field was a controversial figure outside it.

Field, 41, who joined the district attorney's office in 1994, boasts a most impressive résumé. He had attended Columbia University as an undergraduate, and received a law degree and doctorate in history from the University of California-Berkeley. He served in the Marine Corps. And he had friends in the political community, having served on the staffs of former Rep. Don Edwards and former Sen. Alan Cranston.

Disarmingly earnest and charming, Field became a deputy district attorney, he said in one in a series of recent interviews, because ` `I knew I wanted to be a prosecutor, and be able to do what I think is right, not just what is in the client's interest.''

Field's stature grew as he notched a series of successes, sending a serial rapist to prison, and winning a conviction in the 19-year-old murder of a college student, the first for the San Jose Police Department's cold-case division. Repeatedly, Field championed cases involving the most vulnerable victims: He convicted a retired priest for sexually assaulting a mentally retarded kitchen worker; a former deputy sheriffs' union head for assaulting two underage relatives; and an emergency room nurse who sexually assaulted five young patients.

Both through his successes and his aggressiveness, Field's career echoed that of his boss, Kennedy. And by 2003 he had made no secret of his ambition to succeed Kennedy as the head of the office.

But the Mercury News' review of Field's conduct revealed a career marked by troubling incidents, many of which offered clear precursors to his conduct in the case of Auguste and Hendricks. There was no indication that supervisors responded to those incidents by attempting to rein in Field.

• **Violating judges' orders.** Field's transgressions began within a year of his arrival in the district attorney's office, when the young deputy district attorney violated a judicial order in a sexual assault case.

As he pursued the 1995 prosecution, Field had become convinced that the defendant was older than the 13 years he



claimed, perhaps old enough to face higher penalties. He sought court permission to arrange a dental examination that might help confirm his suspicion. But when a trial commissioner refused the request unless there was a hearing at which the teenager's attorney could respond, Field had the examination performed anyway.



Citing Field's transgression, Judge Socrates Manoukian rejected the results of the examination and dismissed the case. The defendant ultimately accepted a plea bargain to lesser charges as a juvenile.

• **Discovery issues.** Repeatedly, the review found, Field has withheld evidence the defense might find favorable.

In 1998, Field prosecuted Juan Romo on charges of sexually assaulting the daughter of his girlfriend. As Field was pushing to go to trial, Romo's attorney, Jaime Leanos, learned from the girl's mother that a medical examination of the girl had been prepared -- despite an earlier denial from the district attorney's office. The examination, it turned out, showed no evidence of sexual conduct, though it also did not rule out that such conduct occurred. Leanos then requested the photographs that were the basis for the report.

Field refused to help Leanos obtain those photographs, saying he had no obligation to provide them because his medical expert had concluded they would not help the defense case. At one hearing, Judge Melinda Stewart said to Field in exasperation: ``You're just accepting the results from your expert as the ultimate truth? That's what a trial is about.''

The trial was delayed repeatedly, over Field's objections, until Leanos got the photographs through a court order to the hospital. Those photographs then became the basis of what Leanos called crucial testimony from a defense expert that no rape had occurred.

The jury ended up unable to reach a verdict; afterward, Romo pleaded guilty to a reduced charge rather than face retrial.

And in a 2002 robbery trial, Field did not reveal to the co-defendants that he obtained a tape-recorded statement indicating one of the alleged victims also was involved in the robbery. The statement raised questions about the truthfulness of the victim's testimony concerning the defendants; Field said he withheld it because he concluded it was unreliable. But Judge Hugh Mullin III ruled on the eve of trial that Field had committed a ``blatant'' violation of his duty to provide evidence to the defense.

• **Misleading the jury.** In a 2001 case, the issue was whether Field had taken advantage of judicial rulings to mislead the jury -- a practice known colloquially as ``sandbagging.'' The case involved allegations that a man had sexually abused his stepdaughter. The defense hoped to establish that the claim had been contrived by the girl's mother, who was divorcing the stepfather. The Mercury News is not naming the stepfather to protect the girl's identity.

To bolster its case, the defense sought to introduce evidence that the girl had previously been sexually abused by her half-brother on more than two dozen occasions, incidents that had led the half-brother to be convicted. These incidents, the defense contended, provided the basis for the girl to concoct, in compelling detail, the accusation against her stepfather.

But Judge Thomas Hastings agreed with Field that the abuse involving the half-brother was not relevant, and excluded any mention of it.

The ruling enabled Field to exploit the judge's ruling and the jury's lack of knowledge during his closing argument. He painted the girl as an innocent forced by her stepfather into a series of lurid acts: ``What 14-year-old girl or 13-year-old girl, as she originally described it, would come up with a story about how she was made to undress while her assaulter stood behind her and masturbated to ejaculation? It's not a story that a 14-year-old girl would be able to make up. She described how during some of the sexual assaults the defendant ran to the bathroom to ejaculate. He ejaculated into the toilet. Again, a sort of detail that just has the ring of truth.''

The jury convicted the stepfather, without knowing those details mirrored the conduct for which her half-brother had been convicted. The stepfather was sentenced to 78 years in prison.

The appellate court did not rule on whether Field engaged in sandbagging, saying his comment was so brief it was irrelevant to the jury verdict. But speaking generally about the practice, David Sklansky, a former federal prosecutor and a professor at Boalt Hall School of Law, University of California-Berkeley, called such misleading arguments ``particularly troubling. Rather than treating the case as a quest for the truth, it turns it into a game, taking advantage of the judge's rulings.''

• **Using unreliable witnesses.** A 2001 case raised some of the sharpest questions about Field's judgment. Field brought charges against Sahr Otis Franco in the slaying of a Milpitas cab driver, Daljit Singh, found slumped over the steering wheel of his taxi in September 2000.



Field's main witness was a dubious choice: Tammy Corralez, 28, who offered to give police information about the slaying in exchange for a break on drug charges. Field appeared at Corralez's hearing and her charges were dismissed, although the details of the hearing remain secret because the transcript is sealed.



Corralez gave Field a changing story. At first she told police she had overheard two men in a drug house, men she knew only as Chris and Spanky, talking about the murder. But by the preliminary hearing, Corralez contended that she had actually seen Franco shoot Singh in a dispute over the fare.

After her testimony in that hearing, several people whom Corralez had said were witnesses to the slaying contradicted her latest version of events. And a parade of witnesses came forward to offer an alibi for Franco.

As his case crumbled, Field acknowledged to the judge: ``Obviously, my main witness, Tammy Corralez, has some severe credibility problems.'' Judge Marliese Kim dismissed the charges, with sharp words for the prosecution case. She said of the witnesses: ``Some of them perjured themselves so blatantly that listening to them was a waste of time.''

Such cases have won Field a reputation among some defense attorneys as a prosecutor who cannot be trusted.

``Hiding evidence, late disclosure, popping out new evidence in the middle of trial -- those are standard tactics'' of Field, said Patrick Clancy, a defense attorney who represented Auguste and a second defendant in a case in which Field's conduct was criticized. ``I've encountered prosecutors who do this type of thing, but never to this extent.''

Leanos, the defense attorney for both Romo and the youth who was given the dental examination, said of Field: ``It doesn't matter what the truth is, once he makes his mind up that someone is guilty. He is a district attorney with a win-at-all-costs mentality.''

Field attributes such criticisms to his willingness to take on high-profile cases and fight vigorously on behalf of crime victims. He said the instances in which judges perceived he disregarded their orders -- the dental examination as well as the Auguste case -- were merely misunderstandings.

Some discovery issues, he said, arose because he failed to appreciate that the material might help the defense; based on the criticisms, he said he now more readily turns over potential evidence.

``I know in my heart that I did not intentionally engage in misconduct,'' he said. ``I take the ethical obligations of the office seriously.''

Many of the interviews with Field were conducted in the presence of Sinunu, the chief assistant district attorney, who said she was troubled both by some of the conduct questioned during the interviews and by Field's responses, which suggested disbelief that anyone would question the appropriateness of his conduct.

After the office reviewed Field's conduct in the case of Auguste and Hendricks, who were released from prison in late 2004, Field was reassigned to prosecute ``three strikes, you're out'' cases, a division in which he no longer reported directly to Sinunu. Kennedy said he believed Field had learned from his mistakes and had earned another chance. In 2005, Sinunu proclaimed her intention to run for district attorney, and Field abandoned his plans to do so.

In an interview late last week, a disappointed Field said he had always previously had the support of his supervisors. No one in the office questioned his handling of cases at the time they were going on, he said.

He produced a letter written by Kennedy in April 2005, recommending that Field be considered for a judicial post. The letter called Field ``one of my best trial deputies over the last decade,'' and added, ``I consider his character to be the highest.''

Asked about the letter, Kennedy said that he would not write the same thing today. ``I have questions about his ethics that I didn't have then,'' he said.

But Kennedy could not explain why he did not have such doubts in April 2005 -- after the Mercury News had questioned Field and Sinunu about Field's cases, and after his conduct in the Auguste case had been a matter of internal review.

## Terence Tighe
### • A series of concerns -- and a series of chances

Years before Field brought an ill-fated murder case based on the word of Corralez, she had helped to dim another rising

star within the office.

When Corralez appeared at the center of a welfare fraud case brought by prosecutor Terence Tighe, it touched off an internal scandal that caused officials in the district attorney's office to lose trust in Tighe. But those officials continued to let him try cases for years -- cases that included the wrongful conviction of Sermeno.

Tighe had taken on the task of cracking down on welfare fraud -- a job so extensive it had become a top priority for the district attorney. Tighe, who joined the office in 1989, adopted an aggressive approach to combating the problem, winning a series of promotions and high praise from Kennedy.

But he found himself snarled in a sequence of events that began when a $135 welfare check to Corralez in 1993 was reported stolen, and the original check was later cashed at a neighborhood grocery store. At issue: Who cashed that check?

Tighe first brought charges against Corralez. Those charges were soon dropped, and Tighe then accused a man named Manuel Lastra, saying Lastra accompanied another woman to the store and vouched to the clerk that she was Corralez.

The case later exploded amid allegations of prosecutorial misconduct. The public defender in the case complained that her client was charged only after Corralez became intimate with Tighe's investigator on the case. She also accused Tighe of failing to inform her that Corralez had initially been charged with the crime.

Sinunu, Tighe's supervisor at the time, concluded Tighe had indeed withheld evidence that would have helped Lastra's defense. Worse, she said, Tighe and the investigator compounded the error by allowing misleading testimony at Lastra's preliminary hearing.

Ultimately, Sinunu dropped the charges against Lastra and began an internal probe of Tighe and his investigator.

The investigation was hindered by the disappearance within the district attorney's office of the file documenting the original criminal prosecution against Corralez. By that time, high-ranking prosecutors harbored enough concerns about Tighe that they searched his office for the file, without success.

Kennedy and Sinunu later sought to fire the investigator, in part over the Lastra case. And Tighe was reassigned to another unit in the office.

But both the investigator and Tighe said then -- and say today -- that the allegations of misconduct were false. Tighe said the office conducted a ``witch hunt'' sparked by public defenders angry at his efforts to ``destroy their gingerbread house.'' He said he hid nothing about Corralez and that the public defender knew of the charges against Corralez anyway. He also said he was the one who first told Sinunu of the allegation about Corralez and the investigator -- contrary to what Sinunu had said about the event.

The investigator said he had informed supervisors of his contacts with Corralez and that he had done nothing improper. A commission ruled in his favor, rejecting Kennedy's attempt to fire the investigator.

Neither Kennedy nor Sinunu would discuss their efforts at disciplinary action. But the incident had a lasting effect: Since the 1995 incident, the office has not fired an experienced attorney. Kennedy points to the cumbersome process as one reason.

In the wake of the Lastra incident, supervisors allowed Tighe to continue to try cases, despite their concerns. And complaints about his tactics continued to mount.

In September 1995, a deputy public defender complained, both in court and to Tighe's supervisor, that he had tried to intimidate a defense witness during a private interview on the eve of trial.

The issue caused the supervisor to be called into court to testify. After the testimony, the judge said Tighe had been ``overzealous.''

A month earlier, Miguel Sermeno was arrested and charged with a hit-and-run felony in which the driver had fled. There was no known connection between him and the passengers who remained in the car. Nevertheless Tighe prosecuted Sermeno, suggesting there was an unspecified ``relationship'' between him and the woman in the front seat.

``He created a bizarre theory to connect a stranger with the car, and put him in the driver seat, when all evidence was to the contrary,'' appellate attorney Sheri Cohen recalled recently. Even when the evidence surfaced suggesting Sermeno



was wrongfully convicted, Tighe ``continued to fight for that conviction, like a dog with a bone.''

At least initially, Tighe was not alone in his view of the Sermeno case. After Cohen called Kennedy, his chief deputy reviewed the case and concluded the evidence supported the conviction. But when the 6th District Court of Appeal ordered a hearing in the case because of defense ineffectiveness, the office decided to drop the case without even discussing the matter with Tighe.

In later cases, Tighe continued to be confrontational with defense lawyers and aggressive in court, twice drawing criticism from the appellate court. His conduct included trivializing reasonable doubt, mentioning a defendant's prison record despite a pretrial order to the contrary, telling a jury that ``nine times out of 10'' a defendant with an alibi could prove it, and suggesting ominously in one case that the jury hadn't learned of everything found in a search of a defendant's bedroom.

Tighe also suggested to a jury that a public defender had tried to induce a witness to change his testimony, and told another jury that a public defender had misled a witness during a pretrial interview.

In a recent interview, Tighe said he had always acted within the bounds of propriety and that the charges he leveled at some public defenders were legitimate. ``I had a low opinion of their ethics and veracity,'' he said.

Tighe was taken off trial work in 1999 and now handles preliminary examinations in felony cases. The district attorney's office has declined to discuss that shift. Tighe blames Sinunu for derailing his career.

## John Schon
### • Secret dealings doom suspect in slaying

The issue with Schon was not what was known about him at the time he won the wrongful conviction of Walker in 1991. The issue, instead, became how the office reacted as evidence of Walker's innocence and accusations of Schon's misconduct mounted.

In retrospect, Walker's case represented the system at its worst. Investigators thought they knew who did it, and persuaded witnesses to confirm their beliefs. The prosecutor promised leniency for testimony against Walker without the knowledge of the defense. And the defense lawyer failed to aggressively challenge the suspect evidence.

The body of Lisa Hopewell, 34, a Princeton University graduate whose life spiraled downward after she became addicted to cocaine, was found bound with duct tape and gruesomely stabbed in the Cupertino condominium of her former boss in January 1991. Hopewell had previously had a relationship with Walker, then 35, and at times the two had publicly argued. Walker quickly became a suspect in the minds of the investigating sheriff's detectives.

Fingerprints on the duct tape matched those of an East Palo Alto drug dealer, Rahsson Bowers. Bowers gave police different explanations before telling them what they suspected: Walker was the key player in the murder of Hopewell. Both men then were charged in the murder.

Schon was a natural choice to handle the high-profile prosecution of Walker. He was among the most experienced prosecutors in the office with more than 15 years of handling homicides. ``I was the go-to guy,'' Schon said recently, ``who was handed messy cases by the office to go out and win.''

The trial began with a thin case against Walker. Judge Paul Teilh had ruled before trial that Bowers' statements to police, portraying Walker as a violent thug who muscled Bowers into assisting him in murder, would not be admissible because the two men were being tried together.

Jurors heard evidence of Walker's tempestuous relationship with Hopewell. They heard witnesses describe Walker as a bully of East Palo Alto's drug-infested streets, someone who terrorized residents into keeping quiet about his crimes. But little evidence tied Walker to the murder scene: His fingerprints were not found there, though the tip of an Isotoner glove was stuck to the duct tape. A former lover of Walker's, Sarah Dunbar, testified that she had given Walker Isotoner gloves that he frequently wore.

Then, after three weeks of testimony by prosecution witnesses, Schon announced that Bowers was entering a guilty plea to second-degree murder. No longer a defendant, Bowers took the stand and described how Walker brutally slew Hopewell while he assisted, in fear for his life.

It was a compelling story -- so compelling that the jury convicted Walker of first-degree murder. But the way it emerged at trial was unfair to Walker.

By waiting until the trial's 11th hour to plead guilty, Bowers was able to remain in the courtroom as a defendant for most of the proceedings; witnesses are typically banned so they cannot tailor their testimony to that of other witnesses. Perhaps more significantly, Bowers' lawyer, assistant public defender Randy Danto, could take part in the proceedings as well. She acted almost as a second prosecutor, defending Bowers by reinforcing Schon's portrayal of Walker as the instigator in her arguments and examination of witnesses.

Both Schon and Danto later would admit that Schon had all but guaranteed near the beginning of the trial that he would cut a plea deal with Bowers. But they did not finalize the deal, Schon said, because his supervisors advised him to wait in hopes other witnesses against Walker would step forward. So it did not have to be disclosed.

``I don't view myself as being unethical or sly,'' Schon said in an interview. ``I also view myself as pretty straightforward.''

Walker and his attorney said they knew nothing of the deal between Schon and Danto. But it was in keeping, Walker said, with the tenor of the case against him.

``What was going on in that courtroom was they were acting out a play,'' Walker said recently. ``They turned me into a monster. I was a black man from East Palo Alto, the murder capital of the world; that was all they needed.''

Walker's troubles were compounded by difficulties with his defense. He had what seemed a strong alibi: He had spent the weekend of the murder with a woman in a Milpitas hotel room. But the woman, who was married at the time, denied she had been with Walker when first asked by police, only to acknowledge it later. Schon and the police pounced on the discrepancy, portraying the woman's later tale as the false version.

Walker complained on appeal that his court-appointed attorney, James Mantell, utterly failed to provide an adequate defense. Prosecutors and Walker's appellate attorneys agree that the trial record establishes a modest effort by Mantell, a former deputy district attorney. They point, for example, to his lackluster questioning of Bowers, once he turned on Walker -- though Mantell contended he felt there was nothing he could do to counteract that testimony.

In the days after Walker's conviction, new evidence surfaced that supported his side of the story. Walker's father tracked down an East Palo Alto resident who said he was with Bowers the night of the murder and that the accomplice was not Walker but a man named Mark Swanson.

The response from the district attorney's office was underwhelming: No one talked to the resident. Instead, in February 1992, Schon and an investigator visited Swanson in jail, where he was being held on an unrelated crime, and asked if he was involved. Swanson denied any role in the crime, and, when his fingerprints did not turn up at the crime scene, that largely ended any reinvestigation.

A month later, a second jail inmate wrote to the district attorney's office, saying he, too, had information that Walker was innocent: He had heard a confession from Bowers' true accomplice. But no one from the district attorney's office bothered for eight years to interview the inmate -- who also would say that Swanson was the man with Bowers that night.

Meanwhile, soon after the conviction, Schon took steps to reward Bowers and Dunbar, Walker's former lover who had testified against him. By negotiating a plea for second-degree murder, Bowers already faced a shorter sentence than Walker did. Schon sought to help Bowers further with a letter to the state parole board that said Bowers had assisted the prosecution ``at great risk to him and his family'' from Walker. ``I strongly urge the parole board to grant Mr. Bowers parole at the earliest available opportunity,'' he added.

And Schon intervened in a crack-cocaine possession charge facing Dunbar, telling another deputy district attorney that she should receive diversion to a drug program, rather than jail, because of the help she gave him on a murder case.

In February 1995, the 6th District Court of Appeal issued its ruling on the Walker case, writing that while the facts ``do not reflect favorably upon the prosecutor,'' the secret negotiations with Bowers did not justify overturning the verdict. Weeks later, the state Supreme Court refused to consider the case.

About the same time, attorney Alison Tucher joined the district attorney's office, where she began to express her own concerns that Walker was innocent. Tucher, whose mother was friends with Walker's, had become interested in the case years earlier, while she was a law student at Stanford University. She raised the issue in conversation with a supervising prosecutor, then followed up with a note reiterating her points.

The district attorney's office did not take Tucher's concerns seriously. In part, Kennedy said recently, supervisors were reacting to Tucher's personal involvement in the case -- an involvement that, they felt, made heeding her input ill-

advised.

Sinunu suggests that another reason officials did not appreciate Walker's possible innocence was the natural tendency, within the prosecutor's office, to be defensive of cases after juries have returned verdicts.

Not even what transpired in a case that Schon handled in 1997 would cause the office to look more closely at Walker's conviction.

The case against Ayana Green and Clinton Fred Wagner, two alleged drug dealers charged with murder, would be Schon's last homicide trial to date. The two were accused in the May 1997 slaying of Harry Garrett III in a strip mall parking lot where, according to police statements, Garrett sold drugs and was a local bully.

A series of drug users and homeless people gave police statements that led to the two defendants. Although there were some conflicts, police concluded Wagner had driven Green to the crime scene, where she emerged from the car to shoot Garrett, and then sped away.

The trial was long and acrimonious, and Schon's conduct was repeatedly an issue. Just as in the Walker case, much of the controversy centered on Schon's dealings with a prosecution witness.

On the eve of opening arguments, after the jury was chosen, Schon first told the defense that he had a new witness to the crime. The witness, Gregory Walton, had been stopped a month earlier by police for driving a car without license plates, according to testimony. But the officer decided not to issue a citation after Walton said he had seen Garrett's murder.

State law on discovery requires prosecutors to tell defense attorneys about such witnesses promptly. But the police apparently stalled even writing up a report for weeks, and Schon delayed telling the defense because, the prosecution would say, it wanted to develop Walton as a confidential informant. Emerson, the judge in the case, concluded that the information had been improperly withheld; he ended up stopping the trial for weeks to give the defense time to investigate Walton and his story.

The discovery violation would be only one way in which Schon acted improperly during the trial, the 6th District Court of Appeal would later rule. On repeated occasions during the trial, Schon disregarded Emerson's rulings on evidence. Perhaps the most telling example emerged after Emerson declared that any drug activities by Green and Wagner should not be introduced -- and Schon then asked questions that caused the forbidden disclosure.

In the middle of the trial, Schon asked a police officer to refresh his recollection of his investigation by reading one paragraph of a police report. The officer responded by saying, in front of the jury, that he had been told Green and Garrett `` had a problem in selling crack.''

The defense objected and demanded a mistrial. Schon insisted the officer's response was `` a surprise to me.'' It shouldn't have been: Earlier in the trial, outside the presence of the jury, Schon had directed the officer to the same paragraph of the same report and received the same answer. As the appellate court later noted, it is misconduct to elicit answers known to be inadmissible and improper.

Schon made no secret of his dismay at rulings by Emerson that limited the evidence he could introduce. In one written motion, Schon asked Emerson to reconsider his decisions, stating: `` It is not lightly that the People take issue with the Court's rulings but after many sleepless nights in the last several weeks awakening with blood boiling indignance (sic) and outrage over the erronious (sic) rulings this court has made, the People felt compelled to make this motion in a last ditch attempt to correct a gross injustice and possibly prevent my first heart attack as well.''

Green and Wagner were convicted of the murder, and the appellate court later affirmed the verdict, finding that Emerson successfully controlled the trial and prevented Schon's misconduct from affecting the outcome of the case.

But after the case was over, Schon was reassigned from homicides to pretrial misdemeanor proceedings -- a significantly lower-profile post. Schon and his supervisors say the reassignment was by mutual consent; Schon said he needed the change for health reasons.

It took years more for the Walker case to unravel.

After Tucher had entered private practice and notified Kennedy in 1999 that she had taken on Walker's case on a pro bono basis, officials in the office assigned their own investigator and took halting steps to re-examine the claims of innocence.

But it was not until after Sinunu assumed the post of homicide chief in late 2002 that the reinvestigation quickened. That reinvestigation ultimately would turn up five witnesses who said Bowers and Swanson had committed the crime. Prosecution witness Dunbar -- the woman who said she had given Walker the Isotoner gloves -- admitted making up her testimony, following what she had been ``told to say'' when questioned by police and Schon.

Finally, in the spring of 2003, criminologists discovered that DNA taken from a cigarette butt found at the scene matched that of Swanson. In August 2004, Sinunu traveled to prison to interview Bowers again; during that interview, he conceded that Swanson, not Walker, had been with him the night Hopewell was murdered. Days later, Swanson pleaded guilty to voluntary manslaughter in the death of Hopewell.

Schon insisted that he did not do anything underhanded in the Walker case: ``Based on what we had at the time, I thought Walker was good for it. Based on what we had at the time, I don't feel I did anything wrong.''

Kennedy, however, no longer defends his office's handling of the case. Schon's dealings with Bowers and Dunbar, Kennedy concedes, helped to convict an innocent man of murder.

*Former Mercury News Staff Writer Noam Levey contributed to this report.*

© 2006 MercuryNews.com and wire service sources. All Rights Reserved.
http://www.mercurynews.com

EXHIBIT "B"



## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appe:l - Sixth App. Dist.

**F I L E D**

NOV 1 5 2006

MICHAEL J. YEHLY, Clerk

By _____
DEPUTY

| | |
|---|---|
| THE PEOPLE, | H029683 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC236592) |
| v. | |
| FIDEL CUEVAS HERNANDEZ, | |
| Defendant and Appellant. | |

Defendant Fidel Cuevas Hernandez appeals a conviction of murder following a second jury trial. On appeal, he asserts the trial court erred in imposing the upper term for a personal use enhancement, and in admitting his confession obtained as a result of a *Miranda*[1] violation. We affirm.[2]

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2] An opinion of the Court of Appeal that does not warrant publication furthers only the " 'review for correctness' " function of the court, and, as such, does not merit extensive factual or legal statement. (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851.) "Memorandum opinions may vary in style, from a stereotyped checklist or 'fill in the blanks' form to a tailored summary of the critical facts and applicable law. [Citations.] The briefest formats are appropriate in cases where the result is controlled by an admittedly constitutional statute and which present no special question of interpretation or application, cases where the result is controlled by an opinion of the Supreme Court of the United States or the Supreme Court of California, or, in the absence of either, where the result is consistent with an intermediate federal or state appellate decision with which

Defendant was charged by information with murder with personal use of a firearm. (Pen. Code, §§ 187, 12022.5, subd. (a)(1)).[3] Defendant was convicted of second degree murder with personal use of a firearm, and appealed to this court on October 22, 2004. We reversed the judgment, and defendant was again tried and convicted of second degree murder with personal use of a firearm and was sentenced to 25 years to life-15 years for the murder and 10 years for the firearm use.

Defendant asserts two claims in this second appeal: (1) the trial court committed error under *Blakely v. Washington* (2004) 542 U.S. 296 when it imposed the 10 year upper term for a firearm enhancement not admitted to by defendant, and not found by the jury; and (2) the trial court erred when it admitted defendant's confessions to the police obtained in violation of *Miranda*.[4] Both claims lack merit.

With regard to defendant's claims under *Blakely*, he concedes that the issue is foreclosed under *People v. Black* (2005) 35 Cal.4th 1238, and only raises it here to preserve it pending the decision in *Cunningham v. California* (2006) __U.S.__, 126 S. Ct. 1329, certiorari granted February 21, 206,. Under *Black,* we find no error in the imposition of the upper term for the personal use enhancement.

As to defendant's additional claim on appeal, that the trial court erroneously admitted defendant's confessions to the police obtained in violation of *Miranda*, defendant states he "raised the same claim of the *Miranda* violation on appeal from his

---

the court agrees, cases where the factual contentions are subject to the routine application of the substantial evidence rule, cases decided by applying the authority of a companion case, cases in which the result is mandated by the United States Supreme Court, and cases where the appeal is not maintainable." (*Id.* at p. 853.) This case is appropriate for a brief format.

[3] We omit the underlying facts of the case because they are not relevant to the issues on appeal.

[4] The second claim was brought in a supplemental brief to which the Attorney General filed a supplemental reply.

2

first conviction, and this Court rejected it. Trial counsel raised it at retrial to preserve it for federal review. The trial court rejected it under the 'law of the case' doctrine. To also preserve this claim for federal review, [defendant] raises it now."

The "law of the case" doctrine precludes a party from obtaining appellate review of the same issue more than once in a single action. When a reviewing court states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal. (*People v. Stanley* (1995) 10 Cal.4th 764, 786; accord, *People v. Shuey* (1975) 13 Cal.3d 835, 848.)

In our prior decision[5] in the first appeal in this case, we analyzed the *Miranda* issue defendant now raises, and rejected it. Under the law of the case doctrine, we reject it in this appeal as well.

### DISPOSITION

The judgment is affirmed.

---

[5] (*People v. Hernandez* (Oct. 22, 2004, H025946) [nonpub. opn.].)

3

EXHIBIT "C"

FILED

MAY 14 2007

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY _____ D. Miller _____ DEPUTY

1

2

3

4

5

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                      COUNTY OF SANTA CLARA

10

11  _____
                                        )
12  In re                               )     No.: CC236592
                                        )
13        FIDEL C. HERNANDEZ,           )
                                        )     ORDER
14  On Habeas Corpus                    )
    _____)
15

16

17      FIDEL C. HERNANDEZ, hereinafter Petitioner, has submitted a

18  petition for a writ of habeas corpus in which he asserts his trial

19  attorney provided ineffective assistance of counsel by failing to

20  exclude certain evidence prior to trial and by failing to object to

21  other evidence at trial.  Petitioner also asserts his appellate

22  attorney provided ineffective assistance of counsel by not raising

23  these and other specific issues on appeal.

24      The petition must be denied without prejudice because this Court

25  does not have a sufficient record to review the claims.  In this

26  case, as in general, the trial court does not have a transcript of

27  the trial proceedings.  The court reporter only furnishes a copy of

28

1  the trial transcript to the Court of Appeal and appellate attorneys -
2  - an additional copy is not made for the trial court because it is
3  not needed. Petitioner explains all his claims were discovered by
4  "Jail House Lawyer Renato" apparently from reading the transcript.
5  This Court needs that same transcript or at least sufficient portions
6  of it so as to have the full context of the claims presented.
7  Additionally, a transcript of the interrogation necessary for
8  examination of the *Miranda* issues is not in the court's possession
9  either.

10  It is Petitioner's burden to include with any petition copies of
11  reasonably available documentary evidence, including pertinent
12  portions of trial transcripts, supporting his claims.  (*People v.*
13  *Duvall* (1995) 9 Cal.4th 464, 474.)  This Court cannot take judicial
14  notice of the items because this Court simply does not have access to
15  them.  Petitioner has the option of either providing only the
16  exhibits or Petitioner may provide an entirely new petition with
17  clearer citations to the record he will provide.  The instant
18  petition is denied without prejudice to doing so.

19

20

21  DATED: ___5/2/___, 2007        DIANE NORTHWAY

22                                 JUDGE OF THE SUPERIOR COURT

23

24  cc:  Petitioner
          District Attorney
25        Research(3-8A)
          CJIC
26

27

28

2

| IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>IN AND FOR THE COUNTY OF SANTA CLARA | **F I L E D** |
|---|---|
| _Plaintiff:<br>PEOPLE OF THE STATE OF CALIFORNIA<br><br><br>_Defendant<br>**FIDEL C. HERNANDEZ** | MAY 1 4 2007<br><br>KIRI TORRE<br>Chief Executive Officer<br>Superior Court of CA County of Santa Clara<br>BY ___D. Miller___ DEPUTY |
| PROOF OF SERVICE BY MAIL OF:<br>ORDER RE: ON HABEAS CORPUS | CASE NUMBER:<br>**No. CC236592** |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this case and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on ___05/14/07___. I declare under penalty of perjury that the foregoing is true and correct.

KIRI TORRE, Chief Executive Officer        By_____ Clerk
                                                Deidre Miller

Fidel C. Hernandez F-09157
H.D.S. P. B5-146
P.O. Box 3030
Susanville, CA 96127


District Attorney


Research (3-8A)

CJIC

EXHIBIT "D"

| IN THE SUPERIOR COURT OF CALIFORNIA<br>IN AND FOR THE COUNTY OF SANTA CLARA | **F I L E D** |
|---|---|
| People of the State of California vs. Fidel C. Hernandez<br><br>In re<br><br>Fidel C. Hernandez,<br><br>On Habeas Corpus | DATE: **Nov. 6, 2007**<br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>BY _____ Deputy |
| **PROOF OF SERVICE OF: Order in re: Habeas Corpus** | Case Number:<br>**CC236592** |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this cause and that a true copy of this document was hand-delivered into the below-listed agency's inter-office pick-up box or was mailed with first class postage fully prepaid in a sealed envelope addressed as shown below and the documents were placed for pick-up or mailed at SAN JOSE, CALIFORNIA on the date shown below. I declare under penalty of perjury that the foregoing is true and correct.

DATED: 11-06-07

Kiri Torre, Chief Executive Officer

BY: Oris A. Wheat, Deputy Clerk

| Fidel C. Hernandez, F-09157<br>H.D.S.P. B5-146<br>P. O. Box 3030<br>Susanville, CA 96127 | Research Attorney Criminal Division<br>190 W. Hedding Street<br>San Jose, CA 95110<br>(Placed in Research Attorney pick up box at HOJ) |
|---|---|
| | Office of the District Attorney<br>70 W. Hedding St.<br>San Jose, CA 95110<br>(Placed in Pony Pick-up Box at HOJ) |
| | CJIC |

Proof of service
Clerk's Certificate of Service

F I L E D

NOV 06 2007

KIRI TORRE
Chief Executive Officer
Superior Court of CA County Santa Clara
BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                           )    No. CC236592
                                )
FIDEL HERNANDEZ                 )    O R D E R
                                )
                                )
On Habeas Corpus                )
                                ) .
_____

FIDEL HERNANDEZ ("Petitioner") petitions again for a writ of
habeas corpus. Petitioner contends his appellate counsel and trial
counsel was ineffective. Petitioner raises the following contentions:
(1) Petitioner's confession was coerced and involuntary; (2)
Petitioner was denied the right of confrontation when the People were
permitted to admit statements made by witnesses Ramos, Soriano, and
Zerpas; (3) The People failed to show due diligence in attempting to
find Ramos, Soriano, and Zerpas; and (4) There is insufficient
evidence to support the conviction.

In order to demonstrate ineffective assistance of counsel, a
defendant must show (1) that his or her counsel's performance was
deficient because the lawyer's representation fell below an objective
standard of reasonableness under prevailing professional norms and
(2) counsel's deficient performance subjected the defendant to
prejudice, i.e., there is a reasonable probability that, but for
counsel's failings, the result would have been more favorable to the

1

defendant. (<u>Strickland v. Washington</u> (1984) 466 U.S. 668, 687-688, cited in <u>In Re Harris</u> (1993) 5 Cal.4th at 832-833; <u>In Re Alvernas</u> (1992) 2 Cal.4th 924, 936-937 and <u>People v. Haskett</u> (1990) 52 Cal.3d 210, 248.)

Petitioner herein has failed to show ineffective assistance or prejudice. Petitioner's confession was not coerced or involuntary.

"It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion. [Citations.] A statement is involuntary [citation] when, among other circumstances, it 'was " 'extracted by any sort of threats . . ., [or] obtained by any direct or implied promises, however slight . . . .' " ' [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' [Citations.]" (<u>People v. Neal</u> (2003) 31 Cal.4th 63, 79.) Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' [Citation.]" (<u>People v. Williams</u> (1997) 16 Cal.4th 635, 660.)

In the present case, petitioner has failed to show that his statements were involuntary.  The officers did not make promises of leniency or threats but rather gave possible consequences if petitioner were to explain what happened. "Impermissible coercion includes the eliciting of a confession by a promise, express or implied, of leniency or advantage to the accused. (<u>People v. Hogan</u>

2

(1982) 31 Cal.3d 815, 838, 183 Cal. Rptr. 817; disapproved on other grounds in People v. Cooper (1991) 53 Cal.3d 771, 836, 281 Cal. Rptr. 90.) Yet, "an improper promise of leniency does not render a statement involuntary unless, given all the circumstances, the promise was a motivating factor in the giving of the statement." (People v. Vasila (1995) 38 Cal.App.4th 865, 874.) Advice or exhortation that it would be better to tell the truth, when unaccompanied by threats or promise, will not render a statement involuntary. (People v. Howard (1988) 44 Cal.3d 375, 398, 243 Cal. Rptr. 842.) A police officer does not invalidate a subsequent confession by merely commenting on the realities of the situation. (In re Gomez (1966) 64 Cal.2d 591, 593-594, 51 Cal. Rptr. 97; People v. Seaton (1983) 146 Cal. App. 3d 67, 74, 194 Cal. Rptr. 33.) When the police merely point out a benefit that flows naturally from a truthful and honest course of conduct, a subsequent statement will not be considered involuntary. (People v. Hill (1967) 66 Cal.2d 536, 549, 58 Cal. Rptr. 340; People v. Thompson (1990) 50 Cal.3d 134, 170, 266 Cal. Rptr. 309.)

Petitioner's further assertions that his Miranda rights were violated are rejected where they were already rejected on appeal.

Petitioner has failed to show that the trial court erred in ruling witness Ramos as unavailable. "Under Evidence Code section 240, subdivision (a)(5), a witness is "unavailable" if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." "What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. (See People v. Cavazos (1944) 25 Cal. 2d 198, 200-201 [153 P.2d 177].) The term is incapable of a mechanical

3

definition. It has been said that the word 'diligence' connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. (People v. Horn (1964) 225 Cal. App. 2d 1, 5 [36 Cal. Rptr. 898].) The totality of efforts of the proponent to achieve presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available (People v. Banks (1966) 242 Cal. App. 2d 373, 377 [51 Cal. Rptr. 398]), whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation]." (People v. Linder (1971) 5 Cal. 3d 342, 346-347 [96 Cal. Rptr. 26, 486 P.2d 1226].)" (People v. Sanders (1995) 11 Cal. 4th 475, 523.)

Here, the record reflects that Alfredo Ramos was found to be unavailable after the prosecution attempted to subpoena him at the address given by the defense. The prosecution subsequently learned Ramos was evicted. The prosecution also attempted to locate Ramos through computer inquiries. Petitioner has failed to show a lack of diligence.

As for the remaining witnesses, petitioner argues that no showing was made to establish that they were unavailable. Petitioner has however failed to show that any objection was made to the testimony for the lack of such a showing. Accordingly, it was not error for his appellate attorney to not raise the issue on appeal as the objection if there was any grounds for it was waived at trial.

Petitioner also fails to show his conviction is not supported by

the evidence. Petitioner contends his conviction was not supported where his statements during his interrogation were unlawfully admitted. However, as explained above, his confession was admissible.

To the extent that petitioner contends that appellate counsel failed to argue prosecutorial misconduct, petitioner has failed to show ineffective assistance. The trial attorney did not object to the prosecution's statements that certain witnesses visited defendant in jail and the issue was therefore waived.

Lastly, petitioner claims his trial counsel was ineffective for failing to suppress his statements, failing to exclude the statements of Miss Maria de la Cruz, failed to object to the prosecutor's statement that defendant was in jail, and failed to exclude the testimony of Ramos, Soriano, and Zerpas.

As discussed above, petitioner's statements during his police interrogation were admissible. Trial counsel therefore did not error. Generally, "if the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (People v. Pope (1979) 23 Cal.3d 412, 426 [152 Cal. Rptr. 732, 590 P.2d 859]; see In re Avena (1996) 12 Cal.4th 694, 721 [49 Cal. Rptr. 2d 413, 909 P.2d 1017].)" (People v. Ledesma (2006) 39 Cal. 4th 641, 746.)

In this case, there could be a satisfactory explanation why trial counsel did not object to the testimony of Soriano and Zerpas especially in light of the fact that an evidentiary hearing was held on Ramos' testimony regarding his availability. The explanation could be that it would have been easily established that Soriano and Zerpas

5

1  were not available where Ramos was a different matter. It would
therefore be unnecessary to require the prosecution to establish that

2  Soriano and Zerpas were unavailable.

3      Petitioner also fails to show that failing to object to de la

4  Cruz's testimony and statements that petitioner was in jail amounted

5  to the requisite prejudice.  Petitioner fails to show how the absence

6  of those statements would establish a reasonable probability of a more

7  favorable outcome.

8      Therefore, the petition for a writ of habeas corpus is DENIED.

9

10

11  DATED:  ___4  Nov___ , 2007

12                                          PAUL BERNAL
                                            JUDGE OF THE SUPERIOR COURT

13

14  cc:  Petitioner
         Office of the District Attorney of Santa Clara County
15       Research
         File

16

17

18

19

20

21

22

23

24

25

26

27

28

6

EXHIBIT "E"



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



Court of Appeal · Sixth App. Dist.

**F I L E D**

DEC 3 – 2007

MICHAEL J. YERLY, Clerk

By _____
                    DEPUTY

In re FIDEL C. HERNANDEZ,

on Habeas Corpus.

H032276
(Santa Clara County
Super. Ct. No. CC236592)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,
participated in this decision.)

Dated _____ DEC 3  2007 _____ BAMATTRE-MANOUKIAN, J. _____ Acting P.J.

F-09157
CSP-1-C-502
P.O.Box ■ 950
Represa, CA 95671

PRIORITY
MAIL
UNITED STATES POSTAL SERVICE®

www.usps.com

Label 107R, February 2006

RECEIVED

MAY 1 6 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102-3483

UNITED STATES
POSTAL SERVICE®

0000

94102

U.S. POSTAGE
FRESNO,CA
93701
MAY 08
AMOUNT

$4.80
00047184-11