1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6       FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  FIDEL C. HERNANDEZ,                )    No. C 08-2539 JSW (PR)
                                      )
9              Petitioner,            )    **ORDER DENYING PETITION**
                                      )    **FOR A WRIT OF HABEAS CORPUS**
10   vs.                              )    **AND DENYING CERTIFICATE OF**
                                      )    **APPEALABILITY**
11  MATHEW KRAMER, Warden,            )
                                      )
12             Respondent.            )
                                      )
13  ─────────────────────────────────)

14                    **INTRODUCTION**

15         Fidel C. Hernandez, a prisoner of the State of California, has filed a pro se petition

16  for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality

17  of his state conviction.  This Court ordered Respondent to show cause why the petition

18  should not be granted.  Respondent filed an answer and a memorandum of points and

19  authorities in support of it, and lodged the record.  Petitioner filed a traverse.  This order

20  denies the petition for a writ of habeas corpus on the merits.

21                **PROCEDURAL BACKGROUND**

22         Petitioner was convicted in Santa Clara Superior Court of second degree murder

23  with personal use of a firearm.  The conviction was reversed on appeal.  At the retrial,

24  Petitioner was again convicted.  The trial court sentenced him on December 2, 2005, to a

25  term of twenty-five years to life in state prison.  The Court of Appeal of California

26  affirmed and the Supreme Court of California denied review.  Petitioner also filed several

27  state habeas petitions, all of which were denied.

28  ///

1    **FACTUAL BACKGROUND**

2        The following statement of the facts is taken from the opinion of the California

3    Court of Appeal on Petitioner's first appeal.  *See People v. Hernandez*, No. H025946,

4    2004 WL 2407226 (Cal. App. 2004) (hereafter cited as "*Hernandez* I").[1]  Petitioner

5    concedes that these are the appropriate facts to be considered here.  (Trav. at 3).

6            Defendant and his brother-in-law Jose Magana worked at Patino's Auto
     Body Shop in San Jose. They were also drug traffickers. Generally, they stored
7        the drugs and drug money in a locker at a public storage facility. Many
         relatives believed that defendant and Magana got along well with each other.
8        Indeed, their families lived together occasionally in Bakersfield and San Jose,
         and defendant and Magana often traveled together. However, in December
9        2001, some fellow employees heard them argue. Defendant accused Magana
         of theft; and Magana told defendant to behave himself "or else." Before
10       Christmas 2001, defendant complained to a relative that Magana did not pay
         him enough. Defendant also said he wanted to make enough money to leave
11       the drug business and return to Mexico.

12       On January 14, 2002, at around 7:00 p.m., defendant and Magana met in two
         cars at a cul-de-sac outside the public storage facility. They had come to
13       retrieve some drugs from the locker. Magana brought his friend Efren Aguilar.
         At around this time, Linda Young, who was working at the facility, saw a
14       Mexican man leaning into the window of another car and talking to the driver.
         The man then entered the car, and it drove into the facility. Minutes later,
15       Young heard gunshots. Around this time, Aguilar called Magana's wife. He
         said Magana had been shot, and defendant had left the facility. At 8:00 p.m.,
16       defendant arrived at the home of a coworker Jose Adrian Zerpas Mendoza.
         Defendant said that he and Magana had fought over drugs. Defendant also said
17       he had thrown his gun into a dumpster at Mendoza's building. Mendoza
         retrieved it and said he would sell it. However Mendoza was unable to sell the
18       gun and threw it back into the dumpster a few days later. About one week
         later, defendant called Magana's niece a few of times. He told her that two
19       drug robbers had shot Magana in the head and in the leg. He also said that a
         suspicious red truck had been parked at the facility that night, and police had
20       shot and killed Magana.

21       On the morning of January 15, 2002, police found Magana's body in the
         hallway of the storage facility. He had been shot eight times with a
22       nine-millimeter gun, once in the back, four times on the right side of his chest,
         and three times in head. Given the nature and location of the wounds, the
23       coroner opined that Magana had been shot first in the back. This shot ruptured
         the main arteries coming from Magana's heart. The rest of the shots occurred
24       after Magana had fallen to the ground. One shot pierced Magana's hand,
         indicating a defensive wound. The shots had been fired from two to seven feet

25

26          [1]  In his appeal from his conviction after reversal and retrial, the conviction to
     which this habeas petition is directed, the court did not set out the facts because they
27   were not relevant to the issues in that appeal.  *See People v. Hernandez*, No. H029683,
     2006 WL 3313635 at *1 n.3 (Cal. App. 2006) ("*Hernandez* II").

28

away. The tight pattern of the shots indicated that the gun had been deliberately aimed. There was a ninth shot that passed through the wall above Magana's head. Police also found two live rounds, indicating that when they failed to fire, defendant had manually ejected them.

On January 27, 2002, police arrested defendant. He waived his *Miranda* [FN1. *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.] rights and was interrogated for three hours. [FN2. Tapes and transcripts of the interrogation were introduced into evidence, but the tapes were not played for the jury. Sergeant Ed Zarate of the San Jose Police Department also testified about what defendant said during the interrogation.] He first told police that he had seen a suspicious truck at the storage facility and went to check on it. He said that later, he saw and heard two Latino men shoot Magana and take heroin and money. The officers disbelieved defendant and said they had surveillance tapes showing that no one else had been in the facility. They repeatedly asked defendant whether Magana had threatened him. Defendant then explained that around Christmas, he had temporarily hidden a shipment of heroin at Patino's because the storage facility was closed for the holidays. However, someone stole the drugs. When defendant told Magana, Magana refused to help him and threatened defendant and his family if defendant did not find the drugs or pay for them. Later, fearful for himself and his family, defendant falsely told Magana that he had returned the drugs to the locker. Magana then insisted they go there. Defendant was reluctant. They argued as they drove there, and Magana warned defendant that the drugs had better be there. Defendant assured him but feared Magana was going to kill him when he discovered the drugs were not there. Defendant did not know whether Magana had a gun with him at the time.

Defendant explained that he had bought a Ruger nine-millimeter handgun a couple of days earlier, loaded it, and later concealed it under his clothing when he and Magana headed to the storage locker. He knew Magana would not find the drugs and knew Magana was looking for a weapon, and so defendant shot him. He said he simply reacted to the fear. After Magana fell to the ground, defendant closed his eyes and continued to shoot. He said he intended only to paralyze him to prevent him from carrying out his threats.

***The Defense***

Defendant testified that both he and Magana carried guns when conducting drug business. He reiterated his story that around Christmas, someone stole a shipment of drugs he had temporarily hidden at Patino's. He said Magana had refused to help him and had instead warned him to pay for the drugs or else something would happen to him or his family.

In early January, Magana reiterated his threat, saying he would kill him or his family if he did not find the drugs. Defendant testified that Magana had threatened other people in the past. Defendant said that whenever the subject of the missing drugs came up, Magana got angry. Around this time, defendant bought a nine millimeter semi-automatic because he became frightened by Magana's threats.

On the day of the shooting, defendant told Magana he had found the drugs. Magana wanted to go check, and they drove to the storage facility in different cars. When defendant arrived, he loaded his gun and chambered a round. Magana arrived with Efren Aguilar, and then defendant and Magana drove into

the facility together. At this time, defendant told Magana the truth: The drugs were not there. Magana said he knew but nevertheless warned that defendant would have to pay one way or the other if the drugs were not there. Defendant wanted to go to the locker at another time, but Magana insisted, saying he wanted to see defendant's expression and hear what defendant had to say at the empty storage locker. Magana seemed more upset than before, and defendant believed Magana would shoot him because the drugs were not in the locker. So, when he and Magana got out of the car, he took his gun. He testified that Magana saw him take it. As they headed to the locker, defendant repeated that the drugs were not there and asked why Magana still wanted to go. Magana again said he knew but wanted defendant to explain himself. According to defendant, Magana had his hand in his pocket. However, defendant did not know whether Magana had a weapon. Defendant explained that because Magana was threatening to kill him right then and there if the locker was empty, defendant thought he was about to be killed. Consequently, he drew his gun and shot Magana.   [FN3. Officer Zarate testified that during the interrogation defendant said that just before he fired, he thought Magana was looking for a weapon, suggesting that he was looking for one in the storage locker. Indeed, on appeal, defendant argues that he shot Magana after Magana opened the locker and saw that it was empty. However, defendant's citations to the record do not establish this. Rather, when read together, defendant's interview, Officer Zarate's testimony, and defendant's testimony more consistently indicate that defendant shot Magana as they headed to the locker.] Defendant admitted that he intended to do so. After Magana fell, defendant closed his eyes and continued to shoot without aiming. Defendant denied that he planned to kill Magana and went to the storage facility for that purpose. He said he did not shoot Magana to kill him but merely to scare him away. After the shooting, defendant left the locker area, took a circuitous path to the cars, told Aguilar that two men had shot Magana, and then fled.

Defendant could not say why the unexpended rounds were on the floor near Magana's body. He admitted lying to many people, including the police, about the details of what happened the night of the shooting. He explained that he lied to police because he wanted to protect others and did not believe the police would help him.

*Id.* at *1-3.

## DISCUSSION

### I.   Evidentiary Hearing

Petitioner asks for an evidentiary hearing in his petition and in his traverse.  The request in the petition was denied in the court's order to show cause "without prejudice to the Court's *sua sponte* reconsideration when considering the merits of the petition."

An evidentiary hearing is held in federal habeas cases only under the most limited circumstances.  *Baja v. Ducharme*, 187 F.3d 1075, 1077-79 (9th Cir. 1999).  An evidentiary hearing on a claim for which the petitioner failed to develop a factual basis in state court can be held only if petitioner shows that: (1) the claim relies either on (a) a

new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2)(A)-(B).  In short, if petitioner did not attempt to present in state court the facts he wishes to present now, for instance by attempting to develop them in his state habeas proceedings, he cannot do so now unless he can show that he meets the provisions of section 2254(e)(2) outlined above.

A prisoner "fails" to develop the factual basis of a claim, triggering § 2254(e)(2), if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000).  "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.  Accordingly, where the prisoner has met the burden of showing he was diligent in efforts to develop the facts supporting his claims in state court, an evidentiary hearing may be held without regard to whether the "stringent" requirements of § 2254(e)(2) apply.  *See id.* at 437; *Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir. 2003); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).

It is petitioner's burden to show that he attempted to develop the facts in state court but was prevented from doing so, for instance by the state court's denial of an evidentiary hearing. *Hutchison v. Bell*, 303 F.3d 720, 747 (6th Cir. 2002)(requiring petitioner to demonstrate "sufficient diligence"); *Baja,* 187 F.3d at 1078-79.

Petitioner does not even address the issue of whether he attempted to develop the facts in state court; he simply writes "evidentiary hearing requested."  He thus has not carried his burden to show that he acted with due diligence in attempting to develop the facts in state court, whether by requesting an evidentiary hearing in state court or submitting declarations there.  He also has not attempted to show that the exceptions of

1  Section 2254(e)(2)(A)-(B) apply to him. The motion for an evidentiary hearing will be

2  denied.

3  **II.     Merits**

4          As grounds for habeas relief, Petitioner contends that: (1) his statement to police

5  was coerced and was taken in violation of his *Miranda* rights; (2) admission of a

6  witnesses statement violated his confrontation rights; (3) admission of the testimony of

7  three witnesses deemed unavailable without adequate investigation violated his

8  confrontation rights; (4) there was insufficient evidence to sustain the convictions; (5)

9  there was prosecutorial misconduct; (6) his trial counsel was ineffective; and (7) his

10  appellate counsel was ineffective.

11          **A.     Standard of Review**

12          The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified

13  under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state

14  prisoner in custody pursuant to a state court judgment, even when the petitioner is not

15  challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002,

16  1009-10 (9th Cir. 2004). Under the AEDPA, this court may entertain a petition for

17  habeas relief on behalf of a California state inmate "only on the ground that he is in

18  custody in violation of the Constitution or laws or treaties of the United States." 28

19  U.S.C. § 2254(a).

20          The writ may not be granted unless the state court's adjudication of any claim on

21  the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable

22  application of, clearly established Federal law, as determined by the Supreme Court of the

23  United States; or (2) resulted in a decision that was based on an unreasonable

24  determination of the facts in light of the evidence presented in the State court

25  proceeding." *Id.* at § 2254(d). Under this deferential standard, federal habeas relief will

26  not be granted "simply because [this] court concludes in its independent judgment that the

27  relevant state-court decision applied clearly established federal law erroneously or

28  incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529

U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

### B.    Statement to Police

Petitioner contends that his confession to police was coerced and was taken in violation of his *Miranda*[2] rights.

Petitioner's first *Miranda* claim is that his due process rights were violated when he was not told that he had a right to an attorney before questioning and a right to have the attorney present during questioning.  His second *Miranda* claim is that the police undermined the *Miranda* advisement about his right to counsel by their later comments.

The second of these *Miranda* claims was raised and rejected in Petitioner's first appeal.  *Hernandez I* at *3-4.  In his second appeal he raised the same claim again, and the court rejected it on law of the case grounds.  *Herndandez II* at *1.

### 1.    First Miranda Claim

The transcript of the police interview at which Petitioner confessed does not include the *Miranda*  warnings.  (*See* Ex. 2 at 2-5.)  The transcript begins with the words (translated into English):  "– if you want, do you understand that right?"  (*Id.* at 2.)  One of the officers who interrogated Petitioner testified at trial that the warning was not on the tape because he thought his partner had started the recorder, so he did not start it until he was into the warning.  (Ex. 3, vol. 6 at 547.)  The officer testified that he read the warning from the official police department *Miranda* warning card.  (*Id.*)

Petitioner first made this contention is a state petition for habeas corpus, so it was not at issue in his direct appeals.  (Ex. 14 at 24.)  Nevertheless, in its opinion on

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)

1   Petitioner's first appeal the court of appeal stated in passing that "[Petitioner]

2   acknowledges that police initially gave proper *Miranda* advisements, and he voluntarily

3   waived his rights and agreed to talk."  (*Hernandez* I at *3.)

4        The only evidence as to whether Petitioner in fact received the full warning is that

5   mentioned above.  The rejection of the purely factual claim by the state courts was an

6   implied finding of fact that the full warning was given, though not recorded.  On the

7   evidence available, the Court cannot say that this was an unreasonable determination of

8   the facts in light of the evidence.  *See* 28 U.S.C. § 2254(d)(2) (AEDPA standard of review

9   for findings of fact).  This claim is without merit.

10            2.    **Second *Miranda* Claim**

11       Petitioner also contends that some of the detectives' later comments in the

12  interview had the effect of undermining the *Miranda* advisements by suggesting that he

13  did not have an immediate right to an attorney.  This claim was raised on direct appeal.

14  The court of appeal said this about it:

15           Defendant contends the court erred in denying his motion to exclude some if
         not all of his confession. He acknowledges that police initially gave proper
16           Miranda advisements, and he voluntarily waived his rights and agreed to talk.
         However, he notes that during the first two hours of his interrogation, he made
17           some comments about an attorney. [FN 4. During the interrogation, defendant
         asked the officers if he was the only suspect. When they did not answer, he
18           said, "I know it ... I ... I was going to get an attorney I don't have money...."
         Later, he related a conversation with a friend, saying "I'm afraid dude I say to
19           him I don't know I want to see an attorney I say to him I'm going to ... in fact
         he tells me I'm going to hire you an attorney, I said to him ... I said to him I
20           don't believe you ... all ... I said to him, I don't have money...." Later, defendant
         asked, "Okay, the county give me an attorney, no?" One officer said that they
21           do. A short time later, when told to start again from the beginning, defendant
         asked, "And why don't I tell it to an attorney." One officer replied, You could
22           do it ... and you could tell it in court too that's all ... all ... what happens now is
         that you could tell it to anyone you want." Defendant said he understood. The
23           officer then said, " But what we are telling you we are the ones doing the case
         first." (Italics added.)] Defendant concedes that these comments, individually
24           and collectively, were not an unambiguous invocation of his right to counsel,
         which would have required the officers to stop the interrogation. (See *Davis v.*
25           *United States* (1994) 512 U.S. 452, 459, 461-462, 114 S.Ct. 2350, 129 L.Ed.2d
         362; *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68
26           L.Ed.2d 378.) However, he asserts that his comments show that he wanted an
         attorney, he was "genuinely confused about the criminal process," and he
27           "naively hoped [the police] might help him." Focusing on the officer's final
         comment that "we are the ones doing the case first," defendant argues that the
28           investigator erroneously implied that defendant could not talk to an attorney

until after the interrogation was over. He claims that this implication corrupted the initial Miranda warnings and nullified his waiver.

First, in our view, defendant's various comments about attorneys during his long interrogation do not demonstrate that he was confused about "the criminal process" in general or any of his *Miranda* rights in particular. After saying he understood his rights and then waiving them, he did ask whether the county would appoint an attorney. At most, however, this question seeks to confirm what he had already been told and said he understood. Indeed, defendant did not then ask when one would be appointed or otherwise indicate that he wanted an attorney at that time. The record also rebuts defendant's assertion that he naively believed the officers. As noted, defendant testified that he lied during the interrogation because he did not believe the officers when they said they were going to help him.

Last, we disagree with defendant's interpretation of the officer's comment about "doing the case first." After being advised of his rights, defendant did not ask any questions about them. Rather, he said he understood them and waived them. He then spoke to police for two hours, lying about what happened. As noted, when police confirmed that the county would appoint a lawyer if he could not afford one, defendant did not request counsel or ask when or how one would be appointed at that time. Thereafter, defendant rhetorically asked, "And why don't I tell it to an attorney." The officer correctly told him he could do so and that he could also tell the judge. Again, defendant did not say he wanted to stop the interrogation or suggest that he wanted a lawyer. Consequently, the officers had no reason to think that defendant was trying to invoke his Miranda rights or that he had any questions about the meaning and scope of his right to consult with an attorney. Rather, they could still reasonably rely on both defendant's statement that he understood his rights and his express waiver. Thus, when we view the investigator's comment about "doing the case first" in context, it simply reflects the circumstances as they appeared to the officer at the time: Defendant had waived his rights, and the police were talking to him-i.e., doing his case-first.

We recognize that the inference defendant draws is not unreasonable. However, the officer's comment was not a response to defendant's request for an attorney or his indication that he no longer wanted to talk to the police. Nor did the comment prevent defendant from asserting his Miranda rights or necessarily convey that defendant could not immediately stop the interrogation so he could consult with an attorney. Accordingly, we do not find that the brief, arguably misleading, comment vitiated the *Miranda* warnings, negated defendant's waiver, and thereby rendered his subsequent statements involuntary.

Defendant's reliance on *Pope v. Zenon* (9th Cir.1995) 69 F.3d 1018 does not change our view of the record. There, the defendant was advised of his right to consult an attorney before being questioned. He immediately asked whether that meant he got an attorney at that moment. A detective told him that an attorney would be appointed the next day at his arraignment. The Ninth Circuit Court of Appeal found that the detective knew the defendant was asking about his right to consult an attorney before the interrogation started, and the detective's response was so misleading that it nullified the previous and correct *Miranda* advisement and vitiated the defendant's subsequent waiver. (*Id.*at pp. 1022, 1024.)

*Pope* is distinguishable. Here, defendant did not ask any questions about his

1
2
3
4

     rights when they were first read to him. His various brief comments over the course of a lengthy interview do not show that he was confused about his right to consult with an attorney before talking to police. And, in context, the officer's last comment did not purport to be an explanation of or statement about defendant's rights, let alone a misleading and erroneous limitation of his rights.

5

(*Hernandez I* at *3-*4.)

6

     Petitioner made two comments indicating he was thinking about a lawyer: "I was

7

going to get an attorney I don't have money" and "I don't know I want to see an attorney"

8

in describing what he had said to a friend.[3]  As Petitioner does not contend that he

9

unequivocally invoked his right to counsel, neither of these bears on this claim.  He also

10

asked two questions regarding an attorney: "Okay, the county give me an attorney, no?"

11

and "why don't I tell it to an attorney?"  The first question was correctly answered "yes,"

12

without any additional comments that would reduce the impact of the *Miranda*

13

advisements, so it also is irrelevant.  The last of the questions, "why don't I tell it to an

14

attorney," however, lies at the heart of Petitioner's argument.

15

     In response to the "why don't I tell it to an attorney" question, Officer Zarate

16

answered: "You could do it ... and you could tell it in court too that's all ... all ... what

17

happens now is that you could tell it to anyone you want." Defendant said "Uh huh."  The

18

officer then said, " But what we are telling you we are the ones doing the case first."  (Ex.

19

2 at 223-24.)  The issue here boils down to whether the officer's telling Petitioner "we are

20

the ones doing the case first" negated, or at least fatally weakened, the otherwise-adequate

21

*Miranda* warning that he had a right to counsel before answering any questions.

22

     Two case are informative.  One, *Pope v. Zenon*, 69 F.3d 1018 (9th Cir. 1995),

23

*overruled on other grounds by United States v. Orso*, 266 F.3d 1030, 1038-39 (9th Cir.

24

2001) (en banc), is relied upon by Petitioner and was distinguished by the court of appeal.

25

*Hernandez I* at *4.

26

27

28

     [3]  The interrogation actually was conducted in Spanish; the quotations here are from the English translation introduced at trial.

1    Because *Pope* was overruled by *Orso*, it is necessary to consider at the outset

2    whether it was overruled on the point for which Petitioner cites it.

3    The general rule is that *Miranda* violations are not subject to "fruit of the poisonous

4    tree" analysis, so interrogators could obtain a confession without giving *Miranda*

5    warnings, then give the warnings and obtain the confession again, and the second

6    confession would not be excluded unless either it or the first confession were found to be

7    involuntary.[4]  *See Orso*, 266 F.3d at 1034-35.  In *Pope* the Ninth Circuit disapproved of

8    that procedure, holding that in the two-step interrogation at issue in that case the second

9    confession should have been suppressed, even though voluntary, as "the direct and

10   unmistakable product of impermissible interrogation."  *Pope*, 69 F.3d at 1025.  It is clear

11   that *Pope* was overruled by *Orso* on this point.  *See Orso*, 266 F.3d at 1036-40.

12   There also was another issue in *Pope*: the suspect had asked if he was entitled to an

13   attorney "now," and been answered by the officers that he would get one when he went to

14   court the next day.  *Pope*, 69 F.3d at 1023.  The Ninth Circuit condemned this as

15   undermining the portion of the *Miranda* warning that tells the suspect that he or she has

16   the right to an attorney before answering any questions.  *Id.* at 1024-25.  The court

17   distinguished *Duckworth v. Eagan*, 492 U.S. 195 (1988), which is discussed below, on

18   grounds that Pope "asked a specific question about his right to have a lawyer present

19   *before and during questioning*."  *Pope*, 69 F.3d at 1024 (emphasis in original).  It is not

20   entirely clear, but for purposes of this discussion the Court will assume that this was an

21   alternative basis for the result in *Pope*, and that this part of the *Pope* holding survived the

22   overruling in *Orso*.

23   In *Duckworth*, the suspect was given *Miranda* warnings that informed him he had a

24   right to an attorney before answering any questions, but also told him that an attorney

25

26       [4]  Because the interrogation here was not a two-step interrogation, and this
     description is provided only as background to the *Pope* opinion, subsequent
27   developments in the law applicable to two-step interrogations are omitted.  *See United
     States v. Williams*, 435 F.3d 1148, 1152-61 (9th Cir. 2006) (discussing appropriate
28   interpretation of *Missouri v. Seibert*, 542 U.S. 600 (2004)).

1   could not be provided until "you go to court."  492 U.S. at 198.  The Court held that the

2   "go to court" language did not negate the advisement about having a right to an attorney

3   before answering questions.  *Id.* at 204-05.

4        Petitioner's argument is that *Pope* established that telling a suspect that he will

5   receive a lawyer later negates the *Miranda* advisement that the suspect has a right to an

6   attorney before answering questions, thus making a subsequent confession inadmissible.

7        Here Petitioner said "maybe I should tell it to an attorney" and the police responded

8   that he could do so, but that "we are the ones doing the case first."  Petitioner's statement

9   at issue here was not a question, and the response was not the sort of flat statement that an

10  attorney would only be provided later that was at issue in *Pope*.  Furthermore, the very

11  point upon which the *Pope* court distinguished *Duckworth* is not present – here, Petitioner

12  did *not* ask a "specific question about his right to have a lawyer present *before and during*

13  *questioning*."  *Pope*, 69 F.3d at 1024-25.  The Court concludes that the result here is

14  controlled by *Duckworth*, not *Pope*.  The questioners' "doing the case first" statement did

15  not render their *Miranda* warning ineffective.  There was no *Miranda* violation, so the

16  state courts' rejections of this claim were not contrary to, or an unreasonable application

17  of, clearly established Supreme Court authority.

18               3.    **Coercion Claim**

19       Petitioner also contends that his confession was coerced by promises made by the

20  interrogating officers.

21       Involuntary confessions in state criminal cases are inadmissible under the

22  Fourteenth Amendment.  *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960).  The

23  voluntariness of a confession is evaluated by reviewing both the police conduct in

24  extracting the statements and the effect of that conduct on the suspect.  *Miller v. Fenton*,

25  474 U.S. 104, 116 (1985); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999).  Absent

26  police misconduct causally related to the confession, there is no basis for concluding that a

27  confession was involuntary in violation of the Fourteenth Amendment.  *Colorado v.*

28  *Connelly*, 479 U.S. 157, 167 (1986); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir.

1989).  A confession is rendered involuntary "having been extracted as the result of a promise of leniency made by the interrogating officers."  *Moore v. Czerniak*, 574 F.3d 1092, 1101& n.10 (9th Cir. 2009). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963))**.**

Petitioner contends that his confession was involuntary because it was induced by promises made by the interrogating officers.  These are the statements upon which he relies:

(1)  Officer Zarate told Petitioner that Petitioner was minimizing what happened, that Zarate could prove the crime did not happen the way Petitioner said it did, and that Petitioner was going to "be in a lot of trouble" if Zarate had to go to the judge with Petitioner's explanation and the evidence Zarate had (Ex. 2 at 171-72);

(2)  Zarate told Petitioner that he could give no guarantees about what would happen if Petitioner told the truth, but that he would tell the judge what happened, that Petitioner cooperated, and when Petitioner said that he would get the same amount of time no matter what, Zarate said that there were degrees of homicide, "like up to five" (*id.* at 196-97);

(3)  Petitioner interprets the "like up to five" statement in item (3) above as being a promise he would receive only five years if he told the truth;

(4)  Zarate told Petitioner that if Petitioner did not tell the truth Zarate would "think the worst" and "present the worst" (*id.* at 202-03);

(5)  the officers said that when Petitioner had explained the reason for the killing, they would go to the judge and say that Petitioner was a "good person," had a wife and children, and did not "run off to Mexico" (*id.* at 273);

(6)  the officers said that pencils have erasers because humans make mistakes, and that the way for Petitioner to erase the mistake he made was to tell the truth (*id.* at 200);

1    (7)  Petitioner asked Zarate about "guarantees" that the officers would "help" him,

2    and Zarate explained that he meant he would investigate what Petitioner told him, write it

3    out, and show it to a judge, and explicitly said that he could not "promise" anything (*id.* at

4    212-13); and

5    (8)  the officers told Petitioner that what he had said up to that point did not fit the

6    facts and that they would put in their report that Petitioner did not tell the truth (*id.* at 213).

7    The last reasoned opinion on this issue was that of the Santa Clara Superior Court,

8    in which the court held that the officers' statements were not promises of leniency, but

9    rather explanations of possible consequences if Petitioner were to tell the truth.  (Ex. 15 at

10   2.)

11   Encouraging a suspect to tell the truth is not coercion.  *Amaya-Ruiz v. Stewart*, 121

12   F.3d 486, 494 (9th Cir. 1997).  Most of the police statements to Petitioner set out above

13   fall into this category, namely (1), (2) (4) (6) and (7), though some fall into more than one

14   category.

15   Nor is it coercive to accurately recite consequences.  *United States v. Haswood*, 350

16   F.3d 1024, 1029 (9th Cir. 2003) (potential penalties or sentences).  Statements (1) and (8)

17   fall into this category.

18   Nor is it police misconduct for officers to indicate that a cooperative attitude would

19   be to the benefit of an accused, unless such remarks rise to the level of being threatening.

20   *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).  Statements (5) and (7) fall into this

21   category.

22   Statement (3), which falls into none of the above categories, is simply a

23   misinterpretation of the officer's statement, which clearly was about how many degrees of

24   homicide there are, not that if Petitioner confessed he would receive only five years in

25   prison.  The officer's point was that, depending on Petitioner's reason for the killing, he

26   might receive less time than if it were, for instance, first degree homicide.  This was an

27   accurate statement.

28   The ultimate issue here is whether the statements by the officers amounted to

1   coercion that overbore Petitioner's will and caused him to confess involuntarily. *See*

2   *United States v. Leon Guerrero*, 847 F.2d at 1366. The officers' statements, considered

3   separately or together, were not such as to do so.

4        There was no constitutional violation in admitting the confession, so the rejections

5   of this claim by the state courts were not contrary to, or an unreasonable application of,

6   clearly established Supreme Court authority.

7        **C.**     **Confrontation Claim – Aguilar Statement**

8        Petitioner contends that his Sixth Amendment Confrontation Clause rights were

9   violated by the admission of testimony by Maria de la Cruz Magana that she received a

10  call from Efren Aguilar saying that Jose Magana had been shot and that Aguilar saw

11  Petitioner leaving the scene.

12       The Confrontation Clause of the Sixth Amendment provides that in criminal cases

13  the accused has the right to "be confronted with witnesses against him." U.S. Const.

14  amend. VI. The Confrontation Clause bars the admission of "testimonial" statements

15  made by persons who are not subject to cross-examination regardless of whether a hearsay

16  exception would otherwise allow the admission of the statements. *Crawford v.*

17  *Washington*, 541 U.S. 36 (2004). "Testimony . . . is typically a solemn declaration or

18  affirmation made for the purpose of establishing or proving some fact." *Id*. at 51 (citations

19  and quotation marks omitted); *see id.* ("An accuser who makes a formal statement to

20  government officers bears testimony in a sense that a person who makes a casual remark to

21  an acquaintance does not."). Although the Court did not precisely define the term

22  "testimonial" in deciding *Crawford*, it did bar the state from introducing out-of-court

23  statements which are testimonial in nature, unless "the declarant is unavailable, and only

24  where the defendant has had a prior opportunity to cross-examine." *Id*. at 59.

25       Petitioner contends that Aguilar's statement to Magana was "testimonial" and thus

26  inadmissable under *Crawford*. However, the statement was made to a person who was not

27  a government employee or agent, and it was not a sworn or solemn declaration made

28  during prior testimony, at a preliminary hearing, before a grand jury, at a former trial or to

1    the police.  Nor was it made to in connection with any government proceeding or

2    investigation.  Rather, it was made to the victim's sister.  *Cf. United States v. Manfre*, 368

3    F.3d 832, 838 (8th Cir. 2004) (statements made to declarants's family members not

4    "testimonial" under *Crawford*).  Petitioner has pointed to no authority, nor is the court

5    aware of any, suggesting that such remarks are "testimonial" for purposes of the

6    Confrontation Clause under *Crawford*.  Indeed, *Crawford* itself suggests to the contrary.

7    *See Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government

8    officers bears testimony in a sense that a person who makes a casual remark to an

9    acquaintance does not.")

10       In any event, where, as here, the Supreme Court has never squarely addressed

11   whether a particular type of statement is testimonial, a state court's admission of such

12   statement at trial is not "contrary to" clearly established Supreme Court precedent or an

13   "unreasonable application" of *Crawford*, under 28 U.S.C. § 2254(d)(1).  *See Moses v.*

14   *Payne*, 543 F.3d 1090, 1099-1100 (9th Cir. 2008) (finding state court's admission of

15   victim's out-of-court statements to emergency room physician as non-testimonial

16   statements not contrary to clearly established federal law or unreasonable application

17   thereof, because Supreme Court had never "squarely addressed" whether statements made

18   to doctors for purposes of medical treatment and diagnosis were testimonial).

19       In sum, the admission of Aguilar's non-testimonial statement to Magana did not

20   violate Petitioner's rights under the Confrontation Clause, and Petitioner is not entitled to

21   habeas relief on this claim.

22       **D.    Confrontation Claim – Unavailability of Witnesses**

23       As noted above, in *Crawford* the Supreme Court held that the Confrontation Clause

24   bars the state from introducing out-of-court statements which are testimonial in nature,

25   unless "the declarants is unavailable, and only where the defendant has had a prior

26   opportunity to cross-examine."  541 U.S. at 59.  Petitioner contends that admission of

27   prior statements by absent witnesses Alfredo Ramos, Rene Soriano, and Jose Adrian

28   Zerpas violated his confrontation rights because there was an insufficient showing that

1   they were unavailable.

2          A district attorney's office investigator, Richard Babwin, testified that he attempted

3   to locate Ramos.  Babwin made "several computer inquires with driver's licence inquires,

4   prior arrests, addresses, data bases that we have access to . . ." without success.  (Ex. 3,

5   vol. 5 at 394.)  When shortly before trial the defense informed him that they had managed

6   to serve Ramos and gave Babwin an address, Babwin twice went to the address, and when

7   there was no answer, left business cards with notes asking Ramos to call.  (*Id.* at 395.)

8   Ramos did not respond.  (*Id.*)  Babwin subsequently learned that Ramos had been evicted

9   and had left no forwarding address or other information that would allow him to be

10  located.  (*Id.*)  Babwin opined that there was nothing more he could do to find Ramos.

11  (*Id.*)

12         District Attorney office investigator Brian Geer testified about his attempts to find

13  Adrian Cerpas.  He ran an "Accurint" database search for Adrian, and also ran searches for

14  Eva Cerpas, purportedly Adrian's sister, and Mario Antonio Cerpas Mendoza, who he

15  believed to be Adrian's brother.  (*Id.*, Vol. 2 at 12.)  From the computer search for

16  Adrian's brother he discovered an alias for Adrian, and that Adrian had an unserved

17  warrant outstanding.  (*Id.*)  There were addresses for "these people," but they could not be

18  found.  (*Id.* at 13.)  Cerpas was not at the address the prosecutor's office had from the first

19  trial.  (*Id.* at 13-14.)  Geer also ran searches for a more current address from drivers'

20  license information, social security, and a criminal justice database.  (*Id.* at 13.)  He then

21  turned the investigation over to Babwin, the investigator who had attempted to find

22  Ramos.  (*Id.*)  Babwin ran additional computer searches and checked addresses, without

23  success.  (*Id.* at 18.)  He also turned the warrant over to the San Jose police department,

24  again without success.  (*Id.*)  His opinion was that there was no further investigation he

25  could do to find Cerpas.  (*Id.*)

26         Geer also attempted to find Rene Soriano.  (*Id.* at 14.)  He checked drivers' licence

27  and criminal records and found nothing.  (*Id.*)  He ran an Accurint check for a pseudonym,

28  Rios, Soriano was known to use, and discovered that Soriano was Ramos' brother-in-law,

1    but of course the prosecutor's office also was unsuccessful in finding Ramos, so that was

2    of little help.  (*Id*. at 14-15)  He obtained an address and phone number for Soriano from

3    the San Jose police department, but Soriano was not at the address and "nobody knew

4    anything about them."  (*Id*. at 15.)  The search was then turned over to Babwin.  (*Id*.)

5    Babwin made additional computer inquiries, and attempted to search California

6    employment records for Soriano but was frustrated by not having a social security number

7    for him.  (*Id*. at 19.)  He also checked drivers' licence records for Soriano and his wife and

8    San Jose police and jail records, again without success.  (*Id*.)  There were no addresses left

9    that he had not checked out, and he did not believe there was anything more he could so to

10   find Soriano.  (*Id*.)

11         The trial court held that Cerpas and Soriano were unavailable.  (*Id*. at 20).  It also

12   held that Ramos was unavailable.  (*Id.*, vol. 5 at 396).  Petitioner's state habeas petition

13   raising this issue was denied in a reasoned opinion by the Santa Clara Superior Court.

14   (Ex. 15 at 4.)  Petitions containing the same claims were denied without comment by the

15   California Court of Appeal and the California Supreme Court.  (Ex. 18, 19.)

16         It is the government's burden to show that the witness is "unavailable."  *Terrovona*

17   *v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988.  This requires that the prosecutor make a

18   good faith effort to obtain the witness's presence.  *Barber v. Page*, 390 U.S. 719, 724-25

19   (1968).

20         In light of the testimony summarized above, the conclusion of the trial court that the

21   witnesses were unavailable, and the implied finding that the prosecution made sufficient

22   good faith efforts to find them, was correct, and the state courts' rejections of this claim

23   therefore was not contrary to, or an unreasonable application of, clearly established

24   Supreme Court authority.[5]

25         **E.     Sufficiency of the Evidence**

26   _____

27         [5]  Petitioner's contention that there was no showing of unavailability at all
     as to Cerpas and Soriano is mistaken, apparently because he failed to notice the
28   hearing transcribed at pages eleven through twenty of the reporter's transcript.

1    Petitioner contends that his due process rights were violated because there was

2    insufficient evidence to support his conviction of second degree murder.

3    The Due Process Clause "protects the accused against conviction except upon proof

4    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5    charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

6    evidence in support of his state conviction cannot be fairly characterized as sufficient to

7    have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

8    constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven,

9    entitles him to federal habeas relief, *id*. at 324.  The federal court determines only whether,

10   "after viewing the evidence in the light most favorable to the prosecution, any rational trier

11   of fact could have found the essential elements of the crime beyond a reasonable doubt."

12   *Id*. at 319.  Only if no rational trier of fact could have found proof of guilt beyond a

13   reasonable doubt, may the writ be granted.  *Id*. at 324

14   Petitioner contends that the evidence was insufficient because his confession was

15   false and other witnesses lied.  To some extent this claim is derivative of the contention

16   that Petitioner's confession was coerced, a claim rejected above.  In the absence of a

17   sufficient showing that the confession was involuntary, and therefore not reliable, this part

18   of Petitioner's argument fails.  In addition, when considering a sufficiency of the evidence

19   claim the Court must "view[] the evidence in the light most favorable to the prosecution,"

20   *id.* at 319, so must assume that the jury believed the witnesses.

21   Under California law, second degree murder is "defined as an unlawful killing

22   committed with malice aforethought.  An unlawful killing with malice aforethought,

23   perpetrated by certain specified means or that is willful, deliberate, and premeditated,

24   constitutes murder in the first degree.  A killing in the course of the commission of certain

25   enumerated felonies also constitutes murder in the first degree.  Second degree murder is

26   an unlawful killing with malice aforethought, but without the elements that elevate an

27   unlawful killing to first degree murder."  *People v. Robertson*, 34 Cal.4th 156, 164 (2004)

28

1   (citations omitted).  "An unlawful killing may constitute manslaughter rather than murder

2   even in the presence of intent to kill or conscious disregard for life, however, if the

3   defendant killed in a "sudden quarrel or heat of passion" or in an unreasonable but good

4   faith belief in the need to act in self defense."  *Id.* at 165.

5          Here, there was evidence that: Petitioner and the victim were engaged in the drug

6   trade; Petitioner had lost a quantity of drugs, about which the victim was angry; Petitioner

7   told the victim that the drugs were in a storage locker, knowing that they were not;

8   Petitioner obtained a firearm a few days before going to the storage area; Petitioner and

9   the victim went to the storage locker, Petitioner armed; Petitioner's first shot was in the

10  victim's back, undermining any claim to provocation; and the victim's wounds were in a

11  tight pattern and Petitioner ejected misfires from the gun, suggesting intent to kill.

12         These facts, construed in favor of the verdict, are more than sufficient to support it.

13  This claim is without merit.

14         **F.     Prosecutorial Misconduct**

15         Petitioner contends that the prosecutor committed misconduct, and thereby violated

16  his due process rights, when he introduced testimony that included references to visiting

17  Petitioner in jail, thereby revealing his "custodial status."  The first reference was in the

18  testimony of Alfredo Ramos that was read to the jury.  In it Ramos twice referred to

19  visiting Petitioner in jail.  (Ex. 3, vol. 5 at 403-06.)  The second reference was in testimony

20  by witness Eva Cerpas, who said that she had visited Petitioner in jail during the first few

21  months of his incarceration there.  (*Id.*, vol. 6 at 614-15, 637.)  These visits occurred in

22  2002, before the first trial.  (*Id.*, vol. 5 at 398, vol. 6 at 542-543.)

23          Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate

24  standard of review is the narrow one of due process and not the broad exercise of

25  supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due

26  process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

27  unfair."  *Id.; Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process

28  analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

1   culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's

2   remarks were improper; if so, the next question is whether such conduct infected the trial

3   with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial

4   misconduct claim is decided "'on the merits, examining the entire proceedings to

5   determine whether the prosecutor's remarks so infected the trial with unfairness as to make

6   the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929

7   (9th Cir. 1995) (citation omitted).

8          A Ninth Circuit case, *United States v. Washington*, 462 F.3d 1124 (9th Cir. 2006),

9   involved a similar issue.  *Id.* at 1136-37.  The court there held that "[a]s with prison garb,

10  when a jury is informed that the defendant remained incarcerated**1137** while waiting for

11  trial, this can undermine the presumption of innocence."  *Id.*  That is, as an abstract matter,

12  prosecutorial references to a defendant's having been in jail can be misconduct.[6]

13  *Washington* makes clear, however, that under many circumstances it may not be.  The

14  *Washington* court noted, for instance, that the impact of referring to a defendant's

15  incarceration is not a constant reminder to the jury of his status as it is with prison garb.

16  *Id.* at 1137.  Moreover, although no state purpose is served by requiring defendants to

17  wear prison garb in front of a jury, in Washington's case there was a state purpose for the

18  reference to incarceration; the prosecutor hoped the jury would infer from the fact that

19  Washington was in jail that if his girlfriend's alibi for him was true she would have come

20  forward with it earlier, so he would not have had to spend more time in jail.  *Id.*

21         In most cases of a prosecutor asking a question that refers to custodial status or

22  calls for a reference to it in the answer, there will not be the sort of "continual" reminder

23

24         [6]  In *Estelle v. Williams*, 425 U.S. 501 (1976), the Court held that when
25  defendants are forced to wear prison garb to trial, the clothing may create a subtle
    prejudice undermining the presumption of innocence.  *Washington*, 462 F.3d at
26  1136 (citing *Estelle*, 425 U.S. at 504-05).  The "constant reminder of the
    accused's condition implicit in such distinctive, identifiable attire may affect a
27  juror's judgment" and no state policy is served by compelling a defendant to dress
    in prison clothing before the jury.  *Estelle*, 425 U.S. at 504-05.
28  .

1  of custodial status that was a concern in *Estelle*, but how frequently the defendants'

2  custodial status is mentioned and how much is made of it still can be evaluated; in this

3  case, the references by the witnesses were the only mentions of Petitioner's having been in

4  jail, and the prosecutor did not refer to his custodial status in closing.  The references thus

5  were far from "constant," and in fact not even frequent.

6      Furthermore, in this case there was a state purpose in inducing the references to

7  Petitioner having been in jail, in that the witnesses' having visited him there tended to

8  show their bias in his favor and thus impeach their testimony.  That testimony therefore

9  was "more relevant and less prejudicial than in the prison garb case."  *Id.*  (footnote

10  omitted).

11      For these reasons, the Court concludes that the prosecutor did not commit

12  misconduct.  That being so, Petitioner has failed to establish the first step under *Darden*

13  for a prosecutorial misconduct due process claim, and thus his claim must fail.  *See Tan,*

14  413 F.3d at 1112 (first step under *Darden*, 477 U.S. at 181, is to determine whether the

15  prosecutor's remarks were improper).

16      Finally, *Washington* is a Ninth Circuit, not Supreme Court, case.  There is no

17  clearly established United States Supreme Court authority that stands for the proposition

18  that a jury's mere knowledge of a criminal defendant's custody status, or the mere mention

19  that a defendant was in custody, is unconstitutional.  For the reasons discussed above, and

20  because there is no Supreme Court authority on the point, the state courts' rejections of

21  this claim were not contrary to, or an unreasonable application of, clearly established

22  Supreme Court authority.

23      **G.   Ineffective Assistance of Trial Counsel**

24      Petitioner contends that his trial counsel was ineffective in failing to adequately

25  pursue the issues discussed above.

26  ///

27      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

28  Sixth Amendment right to counsel, which guarantees not only assistance, but effective

1   assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to

2   prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish

3   that counsel's performance was deficient, i.e., that it fell below an "objective standard of

4   reasonableness" under prevailing professional norms. *Id.* at 687-88.  Second, he must

5   establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a

6   reasonable probability that, but for counsel's unprofessional errors, the result of the

7   proceeding would have been different." *Id.* at 694.  A reasonable probability is a

8   probability sufficient to undermine confidence in the outcome. *Id.*

9        It is unnecessary for a federal court considering a habeas ineffective assistance

10  claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even

11  establish incompetence under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737

12  (9th Cir. 1998).  Similarly, a court need not determine whether counsel's performance was

13  deficient before examining the prejudice suffered by the defendant as the result of the

14  alleged deficiencies. *Strickland*, 466 U.S. at 697.

15       Petitioner contends that trial counsel should have moved to suppress his confession

16  on the grounds discussed in section a, above.   For the reasons discussed there, such a

17  motion would not have succeeded.  Trial counsel cannot have been ineffective for failing

18  to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir.

19  2005)suppressed).  For the same reason, Petitioner's contentions that counsel should have

20  objected to references to his incarceration and moved to exclude the testimony of Alfredo

21  Ramos, Rene Soriano, and Jose Adrian Zerpas, issues discussed above, are without merit.

22       Petitioner's contention that counsel should have objected on hearsay grounds to

23  witness Maria de la Cruz' testimony about the phone call from Aguilar is different,

24  however, because whether the testimony was hearsay has not been addressed above, it not

25  being a proper ground for federal habeas relief.  Petitioner cannot prevail on this issue

26  either, however, because the failure to object was not prejudicial.

27       De la Cruz testified that Aguilar, who had gone with the victim to meet Petitioner at

28  the storage facility, called her and told her that her brother, the victim, had been shot, and

1   that Petitioner had left the storage facility.  Petitioner did not deny shooting the victim, but
2   rather his defense was that the shooting was in response to his fear of the victim.  The
3   phone call added nothing incriminating to this.  Counsel's failure to object did not
4   prejudice Petitioner and was not ineffective.  *See Strickland*, 466 U.S. 694.

5          Trial counsel was not ineffective in any of the ways specified by Petitioner.  This
6   claim is without merit.

7                    **H.      Ineffective Assistance of Appellate Counsel**

8          Petitioner also contends that appellate counsel was ineffective in not raising the
9   above claims.  Because the Court has found that the claims all are without merit, failure to
10  raise them was not ineffective assistance.  *See Miller v. Keeney*, 882 F.2d 1428, 1434 &
11  n.9 (9th Cir. 1989)(habeas petitioner alleging ineffective assistance of appellate counsel
12  must show reasonable probability that, but for counsel's unprofessional errors, he would
13  have prevailed on appeal)(citing *Strickland*, 466 U.S. at 688, 694).  This claim is rejected.

14  **III.   Certificate of Appealability**

15         The federal rules governing habeas cases brought by state prisoners have recently
16  been amended to require a district court that denies a habeas petition to grant or deny a
17  certificate of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases,
18  28 U.S.C. foll. § 2254 (effective December 1, 2009).

19         A petitioner may not appeal a final order in a federal habeas corpus proceeding
20  without first obtaining a certificate of appealability (formerly known as a certificate of
21  probable cause to appeal).  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall
22  grant a certificate of appealability "only if the applicant has made a substantial showing of
23  the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate
24  which issues satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has
25  rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)
26  is straightforward: the petitioner must demonstrate that reasonable jurists would find the
27  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*
28  *McDaniel*, 120 S.Ct. 1595, 1604 (2000).

1      For the reasons set out in the discussion of the merits, above, jurists of reason

2    would not find the result debatable.  A certificate of appealability will be denied.

3              **CONCLUSION**

4      Petitioner's requests for an evidentiary hearing are DENIED.  The petition for a

5    writ of habeas corpus is DENIED, and the Court declines to issue a certificate of

6    appealability.  The Clerk shall close the file.

7      **IT IS SO ORDERED.**

8

9    DATED:  <u>December 15, 2009</u>

10               _____
                 JEFFREY S. WHITE
                 United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28           UNITED STATES DISTRICT COURT

1 | FOR THE

2 | NORTHERN DISTRICT OF CALIFORNIA

3

4

5 | FIDEL C. HERNANDEZ,                                    Case Number: CV08-02539 JSW

6 |                 Plaintiff,                                    **CERTIFICATE OF SERVICE**

7 |    v.

8 | MATHEW KREMER et al,

9 |                 Defendant.
   | _____/

10

11 | I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    | Court, Northern District of California.

12 | That on December 15, 2009, I SERVED a true and correct copy(ies) of the attached, by placing
    | said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
13 | depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
    | delivery receptacle located in the Clerk's office.

14

15

16

17 | Fidel C. Hernandez
    | Folsom State Prison
    | Prisoner Id F-09157
18 | P.O. Box 950
    | B1-C5-02
19 | Folsom, CA 95763

20 | Dated: December 15, 2009

21 |                                                    Richard W. Wieking, Clerk
    |                                                    By: Jennifer Ottolini, Deputy Clerk

22

23 | G:\JSWALL\Pro-Se Prisoner\2008\HernandezF2539.RUL.wpd

24

25

26

27

28